U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

2023 SEP 14  PM 12: 18

|   |   |
|---|---|
| AMBER NEDDO, as guardian and next friend to Z.N., C.B., and A.B., and all others similarly situated, <br><br> *Plaintiff,* <br><br> v. <br><br> MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA LLC, <br><br> *Defendants.* | Case No.: <br><br> *2:23·cv·396* |

CLERK

BY____ *LAW*____

DEPUTY CLERK

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Amber Neddo as guardian and next friend to Z.N., C.B., and A.B., and on behalf of all others similarly situated, brings this Class Action Complaint and Demand for Jury Trial against Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC (collectively, "Defendants" or "Monsanto") for the costs of medical monitoring under Vt. Stat. Ann. tit. 12, § 7202 and alleges as follows:

### INTRODUCTION

1.      Monsanto is a manufacturer and distributor of a class of toxic chemicals called polychlorinated biphenyls ("PCBs"). From the mid-1930s until 1979—when PCBs were ultimately banned—Monsanto was the only commercial manufacturer of PCBs in the United States.

2.      PCBs are human-made chemicals that are highly toxic. Decades of studies show that exposure to PCBs can negatively affect the nervous, immune, reproductive, neurological, and endocrine systems. PCBs are classified as human carcinogens by the World Health Organization and a probable human carcinogen by the U.S. EPA.

3.      Monsanto's company documents show that Monsanto knew as early as the 1930s—over 40 years before the U.S. government banned PCBs—that PCBs were toxic and harmful to human health. Monsanto also knew that PCBs were escaping from their intended applications and becoming a "global contaminant."

4.      Rather than alert the public to these dangers and cease the sale of PCBs, Monsanto actively worked to convince the public otherwise. Although aware that the continued use of PCBs could have widespread harmful effects on human health and safety, Monsanto determined that "selfishly too much Monsanto profit" was at stake and set to work trying to control public perception so that it could continue to manufacture and sell PCBs.

5.      Vermont and its residents were not spared from Defendants' PCB contamination. Defendants manufactured PCBs that were used in Vermont public schools, including in the schools' lighting ballasts, transformers, caulking, and bricks. As Monsanto was aware could happen, the PCBs escaped from these applications and became airborne in Vermont's schools.

6.      Recent air testing in Vermont's public school system revealed high concentrations of PCBs throughout the majority of the schools tested. As a result of their high level of exposure to PCBs in the schools, students and school staff have significantly increased risk of a negative health diagnosis compared to the general population.

7.      Plaintiff is a mother who brings this lawsuit on behalf of her children who attend and attended one of Vermont's PCB-contaminated schools and on behalf of a class of students and school staff who have been exposed to high levels of PCBs. They are now subject to an increased risk of negative health issues and seek the cost of medical monitoring from Defendants pursuant to Vt. Stat. Ann. tit. 12, § 7201, *et seq.*

2

## PARTIES

8.      Plaintiff Amber Neddo and her minor children are natural persons and citizens of the State of Vermont.

9.      Defendant Monsanto Company is a company organized and existing under the law of the State of Delaware with its principal place of business located at 800 North Lindbergh Blvd., Saint Louis, Missouri 63141. Following a merger transaction that closed in 2018, Monsanto Company is a wholly owned subsidiary of Bayer AG.

10.      The original Monsanto Company ("Original Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business. Original Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

11.      Through a series of transactions beginning in approximately 1997, Original Monsanto's businesses were spun off to form three separate corporations. The corporation now known as Monsanto operates Original Monsanto's agricultural products business. Original Monsanto's chemical products business is now operated by Solutia Inc. Original Monsanto's pharmaceuticals business is now operated by Pharmacia LLC.

12.      Defendant Solutia Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 575 Maryville Centre Dr., St. Louis, Missouri 63141. Solutia assumed the operations, assets, and liabilities of Original Monsanto's chemicals business. Solutia Inc., is a wholly owned subsidiary of Eastman Chemical Company.

13.      Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation") is a limited liability company organized and existing under the laws of the State of Delaware with its

3

principal place of business located at 100 Route 206 North, Peapack, New Jersey 07977.
Defendant Pharmacia LLC is successor to Original Monsanto.

14.     These Defendants have entered into agreements to share or apportion liabilities,
and/or to indemnify one or more other entities, for claims arising from Original Monsanto's
chemical products business, including claims arising from Original Monsanto's manufacture and
sale of PCBs.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1332(d) because there are more than 100 class members and the aggregate amount in controversy
exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a
citizen of a state different from at least one Defendant.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a
substantial portion of the events that gave rise to this cause of action occurred in this District.

17.     This Court has personal jurisdiction over Defendants because they transact
business in this District and a substantial portion of the events giving rise to this cause of action
occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### I.     PCBs Are a Proven Toxic Substance

18.     Polychlorinated biphenyls (or PCBs) are a group of man-made chemicals
consisting of carbon, hydrogen, and chlorine atoms. PCBs have no taste or smell, and range in
consistency from an oil to a waxy solid. PCBs were marketed for and used in hundreds of
industrial and commercial applications, including in electrical and heat equipment, as well as
plasticizers in paints, plastics, and rubber products.

4

19.     PCBs are a proven toxic substance as defined by Vermont's Medical Monitoring
For Exposure to Proven Toxic Substances Act.[1]

20.     Congress banned the commercial manufacturing and distribution of PCBs with
the Toxic Substance Control Act in 1979. However, PCBs have a long half-life and degrade
slowly over time, continuing to leach into the surrounding environment decades after their initial
introduction. This characteristic of PCBs to persist over long periods of time has caused many to
refer them as a "forever chemical."

21.     Humans are exposed to PCBs through ingestion, inhalation, or direct contact with
the chemical. One major vehicle for exposure is through inhalation of vaporized PCBs. PCBs
slowly evaporate and release into the air at room temperature (and dramatically faster with an
increase in temperature). Equipment that contains PCBs—such as florescent lighting ballasts—
can also overheat and vaporize significant quantities of these toxic compounds. Indoor exposure
to PCBs is also significantly more hazardous as poor indoor ventilation can lead to a buildup of
high PCB concentrations.

22.     Numerous studies have shown that PCBs are carcinogenic. For example, in 1996,
U.S. EPA assessed PCB carcinogenicity. U.S. EPA's cancer assessment was peer-reviewed by
15 experts on PCBs, including scientists from government, academia, and industry. The EPA
report found that "[j]oint consideration of cancer studies and environmental processes leads to a

---

[1]     *See* Vt. Stat. Ann. tit. 12, § 7201 (defining "proven toxic substance" as "any substance, mixture, or
compound that may cause personal injury or disease to humans and that satisfies one or more of the following
… the substance, mixture, or compound is defined as a 'hazardous material' under 10 V.S.A. § 6602 or under
rules adopted under 10 V.S.A. chapter 159"); Vt. Stat. Ann. tit. 10, § 6602(16)(A)(i) (defining "hazardous
material" as any substance defined in section 101(14) of the federal Comprehensive Environmental Response,
Compensation and Liability Act of 1980); 42 U.S.C. § 9601(14)(B), Section 311(b)(2)(A) of the Federal Water
Pollution Control Act (listing PCBs as a hazardous substance in Table 116.4).

conclusion that environmental PCB mixtures are highly likely to pose a risk of cancer to humans."[2]

23.     Likewise, the National Institute of Occupational Safety and Health (NIOSH) states that it "continues to recommend that PCB's . . . be regarded as potential human carcinogens in the workplace."[3]

24.     PCBs also have significant non-carcinogenic human health effects including reproductive and developmental toxicity, immune system suppression, liver damage, skin irritation, and endocrine disruption. PCBs may also cause kidney and lung damage, cardiac arrhythmia, gastrointestinal disturbances, and numbness in the extremities.

25.     PCBs are also known neurotoxins.[4] This makes them particularly dangerous for children and adolescents because the developing brain is uniquely vulnerable to chemical toxins, and major windows of developmental vulnerability occur in utero, during infancy and in childhood.

26.     Just as PCBs persist as "forever chemicals" in the environment, PCBs persist in the body and bioaccumulate, providing a continuing source of internal exposure after external exposure stops. Thus, adverse health effects from PCBs might manifest years after initial exposure occurs.[5]

---

[2]     *See PCBS: Cancer dose-response assessment and application to environmental mixtures*, EPA, (Sept. 1996), https://www.epa.gov/sites/default/files/2015-10/documents/pcbs_cancer_dose-response_assessment_and_application_to_environmental_mixtures.pdf (last visited Aug 9, 2023).
[3]     *See Polychlorinated Biphenyls (PCB's): Current Intelligence Bulletin 45*, NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (Feb. 1986), available at https://www.cdc.gov/niosh/docs/86-111/default.html.
[4]     Dr. Phillip Grandjean, MD, *Neurobehavioural (sic) Effects of Development Toxicity*, THE LANCET (March 2014), https://www.thelancet.com/journals/laneur/article/PIIS1474-4422(13)70278-3/fulltext.
[5]     Roland Ritter et al., *Intrinsic human elimination half-lives of polychlorinated biphenyls derived from the temporal evolution of cross-sectional biomonitoring data from the United Kingdom*, 119(2) ENV'T HEALTH PERSPS. 225, available at https://pubmed.ncbi.nlm.nih.gov/20934951/.

27.     Individuals do not need decades worth exposure to face negative health effects from exposure. Studies have observed toxic effects from both acute and chronic exposures to PCBs.[6]

## II.     Monsanto Concealed and Misrepresented PCB's Toxic Effects

28.     In the 1930s, Monsanto began manufacturing PCBs after it acquired the Swann Chemical Company. It marketed and sold PCBs primarily under the trade name "Aroclor."

29.     From the 1930s until 1979, Monsanto was the only manufacturer to intentionally produce and distribute PCBs for widespread commercial use. During that timeframe, PCBs were one of Monsanto's most profitable products.

30.     Monsanto engaged in large-scale industrial manufacture of PCBs at two large facilities in the United States: Anniston Alabama, and Sauget, Illinois (where its "Krummich Plant" was located). These facilities employed hundreds of individuals and engaged in the type of large-scale manufacturing classified by the Standard Classification Code as Categories 20–39.

31.     Monsanto widely distributed PCBs nationwide. PCBs were used in many industrial and commercial applications such as paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks, and lubricants. Monsanto also marketed PCBs for household applications in its brochures to customers, including for use in home appliances, food cookers, thermostats, automotive transmission oil, waxes used in dental casting, jewelry, adhesives, moisture-proof coatings, printing inks, papers, sealants and caulking compounds, paints, varnishes, lacquers, and protective or decorative coatings for a number of other finishes.

---

[6]     *See PCBS: Cancer dose-response assessment and application to environmental mixtures,* EPA (Sept. 1996).

32.     Although Monsanto knew as early as 1937 that PCBs were toxic and that PCBs could escape their intended applications and contaminate the environment, Monsanto continued to produce, market, and distribute these dangerous substances for decades. Even when Defendants had a mountain of evidence demonstrating that PCBs caused serious and significant harm to the environment and to humans, they continued to manufacture and sell them.

33.     When public concern began to grow around the hazards associated with PCBs, rather than alerting the public that it knew PCBs were shown to be toxic, Monsanto assembled an internal team tasked with deflecting criticisms of PCBs and of the company itself.

34.     According to their own internal documents, Monsanto worked to hide the dangerous and persistent effects of the hazardous chemicals because "selfishly too much Monsanto profit" would be lost if the company told the truth.

35.     Monsanto concealed the facts pertaining to PCB's toxicity and ubiquity and continued to produce PCBs until it was forced to stop when Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture of PCBs by January 1, 1979.

## A.     *Timeline of Monsanto's Concealment and Misrepresentations about PCBs*

36.     In 1936, factory workers exposed to PCBs developed severe health problems, including chloracne, a severe acne-like condition. Three workers died and the autopsies of two of the workers showed severe liver damage.

37.     The owner of the factory asked Cecil K. Drinker, a Harvard researcher, to investigate the issue. His investigation revealed that rats exposed to PCBs suffered severe liver damage. He presented his findings at a meeting in 1937, which was attended by high-level Monsanto employees. Dr. Drinker also published his results in the September 1937 issue of the *Journal of Industrial Hygiene and Toxicology*.

8

38.     In a 1937 internal company report, Monsanto admitted that "[e]xperimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."

39.     Other studies at this time also confirmed the toxicity of chlorinated hydrocarbons like PCBs. A 1939 study published in the *Journal of Industrial Hygiene and Toxicology*, for example, referenced the worker fatalities investigated by Drinker and went on to conclude that pregnant women and persons previously affected by liver disease are particularly susceptible to adverse effects from chlorinated hydrocarbons, such as PCBs.

40.     An internal Monsanto document from February 1952 noted the "toxicity hazard of Aroclor's fumes is well established," and recounted "the few deaths, and relatively large number of acne or dermatitis cases arising during the war, in connection with fabricators of Navy cable coating materials using a mixture of Aroclor 4456 and Halowax."

41.     In 1955, Mr. E. Mather, Monsanto's Chief Chemist, authored an internal report summarizing the "Process for the Production of Aroclors, Pyranols,7 etc. at the Anniston and at the Wm. G. Krummrich Plant." Attached to that report was an article authored by Robert M. Brown, Chief of the Industrial Hygiene Section of the City of St. Louis Department of Public Welfare, entitled "On the Toxicity of the 'Aroclors'" and published in *The Chemical Analyst* in September 1947. That article explains:

> "There is need therefore to give warning [about PCBs]. For the toxicity of these compounds has been repeatedly demonstrated, both from the standpoint of their absorption from the inspired air, as well as from their effects in producing a serious and disfiguring dermatitis when allowed to remain in contact with the skin."

42.     That same year, the Monsanto Medical Director at the time, Dr. Emmet Kelly,

admitted that Monsanto knew that PCBs were toxic. He stated in a memo at the time, "MCC's

(Monsanto Chemical Company's) position can be summarized in this fashion. We know

Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much

difference, it seems to me, because our main worry is what will happen if an individual

developes [*sic*] any type of liver disease and gives a history of Aroclor exposure. I am sure the

juries would not pay a great deal of attention to MACs [maximum allowable concentrates]."

43.     In November 1955, Monsanto's Medical Department issued an opinion in a

confidential memo advising that workers should not eat their lunches in the Aroclor department

of the Krummrich Plant. It stated:

> (1) Aroclor vapors and other process vapors could contaminate the lunches unless
> they were properly protected.
> (2) When working with this material, the chance of contaminating hands and
> subsequently contaminating the food is a definite possibility.
> (3) It has long been the opinion of the Medical Department that eating in process
> departments is a potentially hazardous procedure that could lead to serious
> difficulties. While the Aroclors are not particularly hazardous from our own
> experience, this is a difficult problem to define because early literature work
> claimed that chlorinated biphenyls were quite toxic materials by ingestion or
> inhalation. In any case where a workman claimed physical harm from any
> contaminated food, it would be extremely difficult on the basis of past literature
> reports to counter such claims.

44.     In January 1957, Dr. Kelly reported that the U.S. Navy had refused to use

Monsanto's PCB products in submarines: "No matter how we discussed the situation, it was

impossible to change their thinking that Pydraul 150 [a PCB product] is just too toxic for use in a

submarine." The Navy's conclusion was based on research it conducted that found that "[t]he

inhalation of 10 milligrams of Pydraul 150 per cubic meter or approximately 2 tenths of a part of

the Aroclor component per million for 24 hours a day for 50 days caused, statistically, definite

liver damage."

10

45.     In addition to its knowledge that PCBs were toxic, Monsanto was also aware that the PCBs it was manufacturing were escaping their intended applications and being released into environments far and wide, and that PCBs' toxic impacts would be felt in virtually every ecosystem in the United States, as well as globally.

46.     In 1966, the *New Scientist* published a short article ("Report of a New Chemical Hazard") summarizing recent research by Søren Jensen, a Swedish chemist, which estimated that PCBs may be spreading through environments in high volumes due to their use in manufacturing.

47.     Søren Jensen had accidentally found enormous quantities of PCB compounds in wildlife while analyzing DDT accumulations. Dr. Jensen presented his findings to the scientific community in 1966, including that PCBs "appear[] to be the most injurious chlorinated compounds of all tested."

48.     In December of 1968, *Nature* published an article by Dr. Richard Risebrough of the University of California entitled, "Polychlorinated Biphenyls in the Global Ecosystem," assessing the presence and effects of PCB in wildlife.

49.     Rather than responding to this information by showing concern for human health and safety, Monsanto repeatedly responded with an intense focus on protecting its own bottom line. In 1967, Dr. Kelly wrote in an internal memorandum: "We are very worried about what is liable to happen in the [United States] when the various technical and lay news media pick up the subject [of PCB contamination]." Dr. Kelly went on to express his concern that customers might "ask us for some sort of data concerning the safety of these residues in humans," and "[t]his obviously might be opening the door to an extensive and quite expensive toxicological/ pharmacological investigation."

11

50.     The manager of Monsanto's Research and Development of Research Organics

Division, W. R. Richard, wrote in 1969 that Dr. Risebrough's article shows not only that PCBs

are "toxic substance[s]" but also because they are easily and broadly distributed in air and water,

they are "an uncontrollable pollutant ... [and] endangering man himself."

51.     Later that same year, W.R. Richard wrote a memorandum titled, "Defense of

Aroclor." Richard's memo lays out a multifaceted defense strategy for protecting its profitable

PCB franchise and responding to growing public concern. He states that the "General Policy" for

the defense strategy is, "Make the govt., States, and Universities prove their case, but avoid as

much confrontation as possible."

52.     Richard's memo notes that critics of PCBs have raised a multitude of different

issues with the compounds in regions throughout the entire United States, so "[w]e can't defend

vs. everything. Some animals or fish or insects will be harmed. Aroclor degradation rate will be

slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower

chlorine compounds. Therefore, we will have to restrict uses and clean-up as much as we can,

starting immediately."

53.     In the same document, Richard admitted that PCBs will leak from virtually all

applications, including such "closed" applications as air compressors, heat transfer, and capacitor

fluids.

54.     That same month, Monsanto formed what it called the "Aroclor Ad Hoc

Committee" to strategize about defending its PCB business against growing public outcry and

growing evidence of PCBs' toxicity and environmental harms.

55.     The Committee's constitutive agenda was to:

        1. Protect continued sales and profits of Aroclors and Terphenyls;

12

2. Permit continued development of uses and sales; and

3. Protect the image of the Organic Division and of the Corporation.

56. The Committee recognized that PCBs had been found in a huge range of

ecosystems, and that "[i]t may be a global contaminant."

57. The Committee explicitly acknowledged that its defense strategy should be one of

willful ignorance. It stated: "Our corroboration of testing of [researcher's] samples adds to our

knowledge and demonstrates a willingness by Monsanto to help define the problem, but it is

expensive and also tightens any possible legal case against us—it rules out possibilities that

Aroclors are not involved."

58. The Aroclor Ad Hoc Committee drafted a confidential report on October 2, 1969.

In that report, the Committee explained its overall findings:

> "The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated—e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.

> Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination. There are, however, a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series."

59. The Aroclor Ad Hoc Committee presented to the Corporate Development

Committee in November 1969. In the presentation, the Ad Hoc Committee recognized that

ignoring the damage that PCBs were causing worldwide was "unacceptable from a legal, moral,

and customer public relations and company policy viewpoint," but ultimately concluded that

Monsanto's profits were more important. It stated, "[T]here is too much customer/market need

and selfishly too much Monsanto profit to go out [of the PCB business entirely]." The

presentation emphasized that pollution from PCBs is "a <u>worldwide</u> ecological problem." (emphasis in original).

60.      Despite the decades of evidence that Monsanto had about the toxic effects of PCBs, and its internal acknowledgment that PCBs are a toxic substance and a "global contaminant," Monsanto's PCB production peaked in 1970.

61.      In order to protect this profit, Monsanto misrepresented the fact of PCBs' toxicity to the public and to government authorities. For example, in a March 24, 1969 letter to the Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption." Similarly, a Monsanto letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems."

62.      Monsanto also misrepresented that it knew that pollution from PCBs was widespread. In the letter to the LA County Air Pollution Control District, in addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."

63.      Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first that, "[b]ased on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic." The letter then reiterated Monsanto's position regarding environmental contamination: "We are unable at this time to conceive of how the PCBs can become widespread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."

14

64.     Just a few years prior, Monsanto recognized in internal company documents that

PCBs can and do escape from their ordinary and intended applications, including closed system

applications. Monsanto blatantly lied about this and other facts to the public in a 1970 statement

it published in the journal *Environment*. Monsanto falsely claimed that (a) PCBs cannot escape

so-called "closed applications" where PCBs are "completely sealed in metal containers"; (b)

PCBs cannot escape applications such as adhesives, elastomers, and surface coatings; (c) PCBs

are not "to our knowledge" used in "household products"; and (d) it is simply "not true" that

PCBs are "highly toxic."

## III.     Monsanto Contaminated Vermont's Public Schools with Toxic PCBs

65.     PCBs were used in building materials and electrical equipment in Vermont

schools, including in caulk, fluorescent light ballasts, sealants, glazing, and flooring adhesives.

Because PCBs regularly leach, leak, off-gas, and escape their intended applications, PCBs have

contaminated the air in Vermont schools. PCBs have also settled in the dust that accumulates in

school buildings.

66.     In June 2021, Vermont passed Act 74, which requires all schools in Vermont that

were constructed or renovated prior to 1980 to conduct indoor air testing for PCBs. Although

Vermont has not finished air monitoring testing at all its public schools, completed test results

already reflect the concern from decades ago of PCBs becoming a "global contaminant."

67.     Indoor air monitoring test results for PCBs reveal high levels of the toxic

chemical throughout the Vermont public schools. PCB concentrations at some schools even

exceed PCB concentrations at Superfund sites. For example, according to the State's testing,

PCB concentrations at the Burlington High School are as high as $6,300 \text{ ng/m}^3$. For comparison,

test results immediately adjacent to the largest PCB Superfund site, located in New Bedford

Harbor, Massachusetts, registered a maximum PCB concentration of 38 ng/m$^3$—over 165 times

lower than the concentration in Burlington High School.[7]

68.     Testing revealed high levels of PCBs throughout the following Vermont schools

(referred to as the "Contaminated Schools"):

- Academy School
- Alburgh Community Education Center
- Bellows Free Academy Middle/Hs (Fairfax)
- Berkshire Elementary School
- Bethel Elementary and White River Middle School
- Brighton Elementary School
- Brownington Central School
- Burlington High School
- Cabot School
- Charlotte Central School
- Concord School
- Danville School
- Green Mountain Union High School
- Lunenburg/Gilman School
- Marlboro Elementary School
- Monument Elementary
- Newport City Elementary School
- North Country Union High School
- Oak Grove School
- Poultney Elementary School
- Shaftsbury Elementary
- Soar Learning Center
- Twin Valley Elementary
- Twin Valley Elementary School
- Twinfield Union School
- Waterford Elementary School

69.     As of July 2023, the Contaminated Schools registered PCB levels in excess of the

state-established screening levels (discussed below) posing an increased risk of cancer and other

health issues.

---

[7]     *See* Keri C. Hornbuckle, *Common Misconceptions about PCBs Obscure the Crisis of Children's Exposure in School*, 56(23) ENV'T SCI. TECH. 16544 (Nov. 18, 2002), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9730834/.

70.     As the Vermont Department of Health ("VDH") continues to test for PCBs, the number of Contaminated Schools is expected to increase.

## IV.     Students and School Staff in Vermont's Public Schools are at an Increased Risk of a Negative Health Diagnosis

71.     Due to their exposure to toxic PCBs, students and school staff are at an increased risk of cancer and non-cancer health issues.

72.     The U.S EPA's Integrated Risk Information System ("IRIS") creates estimates of associated cancer risks from ambient air concentrations of PCB through inhalation. *See* Figure 1.

| Cancer Risk | Ambient Air Concentration |
|---|---|
| 1 in 10,000 | $1 \mu g/m^3$ or $1,000 \text{ ng/m}^3$ |
| 1 in 100,000 | $0.1 \mu g/m^3$ or $100 \text{ ng/m}^3$ |
| 1 in 1,000,000 | $0.01 \mu g/m^3$ or $10 \text{ ng/m}^3$ |

**(Figure 1.)**

73.     The U.S. EPA's IRIS cancer risk is understated, however, as it requires a higher-risk slope factor for inhalation of an aerosol or dust contaminated with PCBs. That means for individuals exposed to dust contaminated with PCB or aerosolized PCBs—such as the kind found throughout Vermont's public schools—the cancer risk is significantly higher than shown in Figure 1. That is equally true for PCB exposure at a young age such as among school children.

74.     To identify the sources of PCBs and evaluate the health risk from. exposure, the VDH derived a PCB Screening Level of $15 \text{ ng/m}^3$ which corresponds to an additional cancer risk of one in a million. The VDH has also promulgated State Action Levels ("SALs") for schools which serve as an indicator to abate PCB sources inside of a building. The minimum cancer risk for the SALs correspond with a cancer risk of 6 in a million.

75.     The VDH has set the SALs based on an exposed individual's age and length of exposure. The SALs for pre-kindergarten is 30 ng/m³, 60 ng/m³ for kindergarten through 6th grade, and 100 ng/m³ for 7th grader through adults. *See* Figure 2. These age-adjusted SALs take into account an individual's dosage based on their average exposure derived from the amount of time they spend in school as well as an average individual's age and weight. *See* Figure 3.

**Table 1. PCB School Indoor Air Action Levels ng/m³**

|  | Pre-Kindergarten | Kindergarten to Grade 6 | Grade 7 to Adult |
|---|---|---|---|
| School Action Level | 30 | 60 | 100 |

**(Figure 2.)**

| Exposure Estimates and Screening Values | | | | | | |
|---|---|---|---|---|---|---|
| Parameter | Child care (1 to less than 3 years old) | Preschool (3 to less than 6 years old) | Elementary school (6 to less than 12 years old) | Middle school (12 to less than 15 years old) | High school (15 to less than 19 years old) | Staff adult (19 years and older) |
| Exposure time (hours per day) | 9.75 | 9.75 | 9.75 | 9.75 | 9.75 | 9.75 |
| Exposure frequency (days/year) | 235 | 235 | 235 | 235 | 235 | 235 |
| Exposure duration (years) | 2 | 3 | 6 | 3 | 4 | 30 |

**(Figure 3.)**

76.     As shown in Figures 2-3, children and teenagers require a smaller dosage and for a shorter amount of time than an adult to have a similar cancer risk from PCB exposure. While an adult exposed to 100 ng/m³ of PCBs for 30 years has an increased risk of cancer, a sixth-grade student requires a 40% lower dosage (60 ng/m³) for only three years of exposure to face a similar

cancer risk. Similarly, a high school student only needs four years of exposure at the same dosage as an adult to exceed the SAL.

77.     The Contaminated Schools exceed VDH's SALs and pose a significant health risk to students and school staff. By way of example, PCB concentrations found at Burlington High School is 6,300 $ng/m^3$. This concentration corresponds with a cancer risk of greater than one in 10,000 and 63 times the SAL.

78.     Since the discovery of PCBs at Burlington High School, officials have shuttered the school. The school has been deemed too contaminated to be fixed and will be demolished. The extent of contamination is so widespread that PCBs have even leeched into the surrounding soil.

79.     Similarly, Oak Grove School, which serves students K-8, has a PCB concentration of 120 $ng/m^3$ which corresponds with a cancer risk greater than one in 100,000 for adults and significantly more for kindergarten students. The PCB levels at Oak Grove School exceed SALs by at least two for kindergarten students.

80.     Cabot School also has been contaminated with PCBs at a concentration of 210 $ng/m^3$ which also corresponds with a cancer risk greater than one in 100,000 for adults and significantly more for pre-K students that attend the school.

**V.     Medical Monitoring Testing Is Necessary**

81.     The National Institute of Occupational Safety and Health has established medical surveillance guidelines for setting up medical monitoring programs related to PCB exposure. These include taking medical and work histories of affected individuals; informing physicians of the adverse health effects from exposure to PCBs and providing them with available workplace

sampling; conducting evaluations of the skin, liver, and nervous system; and taking blood serum measurements of PCBs.

82.     Similarly, the New Jersey Department of Health recommends that, following potentially high exposures to PCBs, individuals receive liver function tests and examinations of skin and fingernails. If symptoms develop or overexposure is suspected, blood PCB levels and examination of the nervous system are conducted.

83.     Medical surveillance programs for workers who were chronically exposed to PCB have been developed and deployed. In one program, physicians took a detailed documentation of participants' general and occupational history, including patients' complaints, diseases, and nutritional habits. Examinations were performed to detect possible neurological, immunological, psychological, hormonal, and skin effects. DNA exposure was assessed using comet assay and antioxidative status was determined.

84.     Similarly, initial medical surveillance programs for workers who have been acutely exposed to PCBs have also been deployed. For instance, after a transformer containing PCBs exploded in a federal building, a utility company agreed to provide the victims with initial medical surveillance. These workers were surveilled using blood tests and tissue sample tests.

## FACTS SPECIFIC TO PLAINTIFF

85.     Plaintiff's children attended the Cabot School in Cabot, Vermont.

86.     While students at the Cabot School, Plaintiff's children were exposed to PCB levels that were magnitudes higher than the SALs and, therefore, have a significantly increased risk of serious developing PCB-related health consequences, including developing certain cancers.

87.     As students at the Cabot School, Plaintiff did not know (nor could she) that her children were exposed to PCBs.

## CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action pursuant to pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3) on behalf of her children and all Members of the "Class," defined as:

All individuals that attended or worked at a Contaminated School.

89.     The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) persons who properly execute and file a timely request for exclusion from the Class; (3) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (4) Plaintiff's counsel and Defendants' counsel; and (5) the legal representatives, successors, and assigns of any such excluded persons.

90.     **Numerosity**: The exact size of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of hundreds, if not thousands, of individuals. Class Members can be easily identified through School District records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other class action controversies.

91.     **Typicality**: Plaintiff's claims are typical of the claims of other Class Members, in that Plaintiff's children and the Class Members sustained similar injuries and damages as a result of Defendants' tortious conduct and were exposed to PCBs at levels that are potentially injurious to their health.

92.    **Adequate Representation**: Plaintiff will fairly and adequately represent and

protect the interests of the Class and have retained counsel competent and experienced in

complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff has no

interests that conflict with or are antagonistic to those of the Class, and Defendants have no

defenses unique to Plaintiff.

93.    **Commonality and Predominance**: There are many questions of law and fact

common to the claims of Plaintiff and the Class, and those questions predominate over any

questions that may affect individual Class Members. Common questions for the Class include,

but are not necessarily limited to the following:

   a.    Whether Defendants were the operator of a large facility from which a proven
         toxic substance was released;

   b.    Whether the Plaintiff's children and the Class were exposed to PCBs at a rate
         significantly greater than the general population;

   c.    Whether Defendants acted tortiously when they concealed information about the
         toxicity of PCBs from the public;

   d.    Whether Defendants acted tortiously in misrepresenting material facts about
         PCBs to the public, including its toxicity and its ability to escape its intended
         applications;

   e.    Whether Defendants acted tortiously in manufacturing and distributing a product
         it knew or should have known to be dangerous;

   f.    Whether, as a result of Defendants' conduct, Plaintiff's children and the Class
         have suffered an increased risk of contracting a serious disease;

   g.    Whether Plaintiff and the Class are entitled to relief in the form of a court-
         supervised medical monitoring program.

94.    **Superiority**: This case is also appropriate for class certification because class

proceedings are superior to all other available methods for the fair and efficient adjudication of

this controversy as joinder of all parties is impracticable. The damages suffered by the individual

Class Members will likely be relatively small, especially given the burden and expense of

individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it

would be virtually impossible for the individual Class Members to obtain effective relief from

Defendants' misconduct. Even if Class Members could sustain such individual litigation, it

would still not be preferable to a class action, because individual litigation would increase the

delay and expense to all parties due to the complex legal and factual controversies presented in

this Complaint. By contrast, a class action presents far fewer management difficulties and

provides the benefits of single adjudication, economy of scale, and comprehensive supervision

by a single Court. Economies of time, effort and expense will be fostered, and uniformity of

decisions ensured.

### CAUSE OF ACTION
### Medical Monitoring Pursuant to Vt. Stat. Ann. tit. 12, § 7202
### (On Behalf of Plaintiff and the Class)

95.     Plaintiff alleges the foregoing allegations as set forth fully herein.

96.     PCBs are "proven toxic substances" as explained in Paragraph 20.

97.     Monsanto was an owner and operator of a "large facility" because at any one

time, its PCB factories employed at least 10 full-time employees and engaged in a manufacturing

activity that falls within the Standard Industrial Classification code Category 20–39.

98.     Defendants manufactured PCBs at one or more of its large facilities.

99.     Defendants released PCBs from one or more of its large facilities and PCBs

entered the air and accumulated in the dust of the Contaminated Schools.

100.    Monsanto, through its decades-long campaign to conceal and minimize the known

dangers of PCB, acted tortiously in doing so. Even worse, Monsanto continued to market and sell

PCBs despite knowing the negative health effects of exposure to the chemical.

101.    As a proximate result of their exposure to PCBs, Plaintiff's children have an increased risk of contracting a serious disease, including cancer, reproductive issues, endocrine disorders, neurological problems, and other diseases.

102.    Indeed, Plaintiff's children and the Class now face an increased risk of serious health consequences magnitudes greater than the general public.

103.    This increased risk of disease makes it medically necessary for Plaintiff's children to undergo periodic medical examination different from that prescribed for the general population in the absence of exposure.

104.    Monitoring procedures, such as blood serum measurements, tissue sampling, and evaluation of skin, liver, and nervous systems, exist and are reasonable in cost and safe for use.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Amber Neddo as guardian and next friend to Z.N., C.B., and A.B., and on behalf of the Class, respectfully requests that this Court enter an Order:

A.    Awarding the cost to fund a court-supervised medical monitoring program administered by one or more appropriate health professionals, including professionals with expertise in exposure to toxic substances or expertise with treating or monitoring the relevant latent disease or diseases;

B.    Awarding reasonable attorneys' fees and other litigation costs reasonably incurred; and

C.    Any other and further relief as the Court deems just, proper, and equitable.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**AMBER NEDDO,** as guardian and next friend to
Z.N., C.B., and A.B., and all others similarly
situated,

Dated: September 8, 2023

By:
Jimmy Rock
EDELSON PC
1255 Union Street NE, 7th Floor
Washington, DC 20002
Tel: 202.270.4777
jrock@edelson.com

J. Eli Wade-Scott (*pro hac vice* to be sought)
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
ewadescott@edelson.com

*Counsel for Plaintiff and the Proposed Class*