# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

AMBER NEDDO, as guardian and next friend
to Z.N., C.B., A.B., and all others similarly
situated,

        Plaintiff,

   v.

MONSANTO COMPANY, SOLUTIA INC.,
and PHARMACIA LLC,

        Defendants.

Case No. 2:23-cv-396-GWC

# MOTION TO DISMISS OF
# MONSANTO COMPANY, SOLUTIA INC., AND PHARMACIA LLC

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

I.    Until 1977, Old Monsanto Manufactured PCBs in Out-of-State Facilities, Which Third-Party Manufacturers Incorporated into Their Own Finished Products............................................................................................................ 3

II.    In 2022, Vermont Created a Medical-Monitoring Claim Against Companies that Release Chemicals from Their Large Facilities into the Environment........... 4

III.    Plaintiff Brings a Suit that Would Dramatically Expand the Medical-Monitoring Statute.................................................................................. 6

ARGUMENT ........................................................................................................... 9

I.    This Court Lacks Personal Jurisdiction over Defendants ...................................... 9

II.    The Complaint Fails to State a Claim Under Rule 12(b)(6) ................................ 10

A.    By Its Terms, § 7202 Unambiguously Applies Only to the Release of Toxic Substances from "Large Facilities" Directly into the Environment................................................................................................ 11

B.    Section 7202 Does Not Apply Retroactively, so Defendants Cannot Be Liable for Old Monsanto's Decades-Old Conduct ................. 17

C.    The Complaint Fails to Satisfy Other Statutory Requirements ............... 19

1.    The Complaint Fails to Allege Tortious Conduct or Causation............................................................................................. 19

2.    The Complaint Fails to Allege Exposure to PCBs "at a Rate Significantly Greater" than the General Population ..................... 21

3.    The Complaint Fails to Allege that Medical Monitoring is Necessary or Reasonable in Cost ................................................. 22

III.    Plaintiff Lacks Standing to Assert Claims on Behalf of Absent Class Members ........................................................................................................... 23

CONCLUSION......................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*,
  915 F.2d 1355 (9th Cir. 1990) ..............................................................15

*A.B. v. S.U.*,
  298 A.3d 573 (Vt. 2023) ....................................................................17, 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................11, 14, 23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................11

*Bourgeois v. A.P. Green Indus., Inc.*,
  716 So. 2d 355 (La. 1998) .................................................................21

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
  582 U.S. 255 (2017)............................................................................9

*Buxton v. Springfield Lodge No. 679, Loyal Ord. of Moose, Inc.*,
  99 A.3d 171 (Vt. 2014)......................................................................19

*Carpenter v. Vt. Dep't of Motor Vehicles*,
  465 A.2d 1379 (Vt. 1983)...............................................................17, 18

*Coty v. Ramsey Assocs., Inc.*,
  546 A.2d 196 (Vt. 1988)....................................................................20

*Digit. Realty Tr., Inc. v. Somers*,
  138 S. Ct. 767 (2018) ........................................................................12

*DVL, Inc. v. Niagara Mohawk Power Corp.*,
  490 F. App'x 378 (2d Cir. 2012) ......................................................14

*Fat Brands Inc. v. Ramjeet*,
  75 F.4th 118 (2d Cir. 2023) ..............................................................19

*Fleurrey v. Dep't of Aging & Indep. Living*,
  292 A.3d 1219 (Vt. 2023)..................................................................19

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021)....................................................................9, 10

*Henson v. Santander Consumer USA Inc.*,
  582 U.S. 79 (2017).........................................................................15, 18

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945)............................................................................9

*Jazini v. Nissan Motor Co.,*
  148 F.3d 181 (2d Cir. 1998)..........................................................................9

*John Larkin, Inc. v. Marceau,*
  959 A.2d 551 (Vt. 2008)..............................................................................19

*Lowry v. Keyes,*
  14 Vt. 66 (1842)............................................................................................17

*Montanio v. Keurig Green Mountain, Inc.,*
  276 F. Supp. 3d 212 (D. Vt. 2017)..............................................................20

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
  693 F.3d 145 (2d Cir. 2012)...................................................................23–24

*Raines v. Byrd,*
  521 U.S. 811 (1997).....................................................................................25

*Ret. Bd. of the Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon,*
  775 F.3d 154 (2d Cir. 2014)...........................................................23, 24, 25

*Shires Hous., Inc. v. Brown,*
  172 A.3d 1215 (Vt. 2017).......................................................................12, 16

*State v. Baker,*
  177 A.3d 1093 (Vt. 2017).............................................................................20

*State v. Willis,*
  494 A.2d 108 (Vt. 1985)...............................................................................17

*Sullivan v. Saint-Gobain Performance Plastics Corp.,*
  226 F. Supp. 3d 288 (D. Vt. 2016)...........................................................5, 16

*Sullivan v. Saint-Gobain Performance Plastics Corp.,*
  431 F. Supp. 3d 448 (D. Vt. 2019)................................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007).......................................................................................8

*United States v. Union Corp.,*
  277 F. Supp. 2d 478 (E.D. Pa. 2003)..........................................................15

*Vill. Green at Sayville, LLC v. Town of Islip,*
  43 F.4th 287 (2d Cir. 2022) .......................................................................3, 8

*Wesco, Inc. v. Sorrell,*
  865 A.2d 350 (Vt. 2004)...............................................................................12

### Statutes

Vt. Stat. Ann. tit. 1, § 214 ................................................................................17

Vt. Stat. Ann. tit. 10, § 6615 ......................................................................15, 18

Vt. Stat. Ann. tit. 12, § 7201 ....................................................................12, 13, 14, 16, 19

Vt. Stat. Ann. tit. 12, § 7202 ........................................1, 2, 5, 11, 12, 13, 16, 17, 19, 21, 22

## Rule

Fed. R. Civ. P. 12 ............................................................................................................10

## Other Authorities

*$34M Settlement Agreement Reached in Bennington PFOA Suit*, Bennington
   Banner (Nov. 11, 2021) .................................................................................................6

American Heritage Dictionary (5th ed. 2012) .................................................................21

*"Approved" Cabot School District Board of Directors' Board Meeting*
   (Oct. 24, 2022) ..............................................................................................................8

Black's Law Dictionary (11th ed. 2019)...................................................................12, 21

*Comparison of Medical Monitoring Elements*, VT LEG #359633 v. 1
   (Jan. 19, 2022)................................................................................................................6

EPA, *Exposure Levels for Evaluating Polychlorinated Biphenyls (PCBs) in
   Indoor School Air*...........................................................................................................7

EPA Interdepartmental Task Force on PCBs, *Polychlorinated Biphenyls and the
   Environment* (May 1972) ...............................................................................................4

EPA, Office of Toxic Substances, *Polychlorinated Biphenyls
   1929-1979: Final Report* (1979)...............................................................................3, 4

Letter for Senators from Conservative Law Foundation (Jan. 26, 2022) ........................6

Nat'l Inst. of Occupational Safety and Health, *Polychlorinated Biphenyls
   (PCB's): Current Intelligence Bulletin 45* (Feb. 1986) ..........................................22–23

N.J. Dep't of Health, *Hazardous Substance Fact Sheet* .............................................22

Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in
   Commerce, and Use Prohibitions, 44 Fed. Reg. 31,542 (May 31, 1979).................4

*Scott Signs Medical Monitoring Bill into Law*, VTDigger (Apr. 21, 2022) ...................6

Vt. Agency of Nat. Res., *PCB: Cabot School* ...............................................................8

Vt. Agency of Nat. Res., *PCB in Schools*.....................................................................9

Vt. Dep't of Env't Conservation, *PCBs in Schools* ......................................................7

## INTRODUCTION

From the mid-1930s to 1977, the former Monsanto Company ("Old Monsanto") lawfully manufactured polychlorinated biphenyls ("PCBs") at two factories, in Alabama and Illinois. It then sold those chemicals to third-party industrial customers, which used them as industrial fluids or incorporated them into finished products—including capacitors in fluorescent light ballasts, transformers, paint, and caulk—that they in turn sold to others. In this case, Plaintiff Amber Neddo claims that her three minor children were exposed to elevated levels of PCBs at a school in Vermont. Now, decades after Old Monsanto ceased manufacturing PCBs, she invokes a Vermont statute enacted in 2022 in an attempt to impose medical-monitoring liability on defendants Monsanto Co., Solutia Inc., and Pharmacia LLC.[1]

Plaintiff's suit stretches the medical-monitoring statute far beyond what the Vermont Legislature intended. The statute creates a cause of action only when a toxic substance is "released" "from" a "large facility" (such as a factory) directly into the environment. Vt. Stat. Ann. tit. 12, § 7202. Old Monsanto never had a PCB-manufacturing facility in Vermont, much less near the school at issue; its only alleged role was lawfully selling PCBs to third parties for use in lawful finished products. Plaintiff would thus transform this narrowly targeted provision regulating the discharge of toxic substances in Vermont into something entirely different: a boundless product-liability statute that applies to out-of-state manufacturers of toxic raw materials any time those substances escape from any finished product in Vermont. The sale of raw materials is not what the Vermont Legislature intended to regulate, as the statute's plain text makes clear

---

[1] According to the Complaint, Old Monsanto was reorganized into these three separate companies in a series of transactions beginning in the late 1990s. Compl. ¶ 11. The Complaint alleges that the current Monsanto Co. carries on Old Monsanto's agricultural products business; Solutia Inc., operates Old Monsanto's chemical-products business; and Pharmacia LLC inherited the pharmaceutical business. *Id.*

and historical evidence confirms.  In addition, the statute does not apply retroactively, yet Plaintiff would have this Court apply it to conduct that—the Complaint acknowledges—took place more than 40 years before the statute was enacted.  The Complaint thus suffers from multiple fundamental flaws and fails to state a claim.

Moreover, due process does not allow Plaintiff to hale the named out-of-state Defendants into federal court in Vermont with only a conclusory allegation that Defendants transact business in the State.  Plaintiff fails to plead, as she must, particular facts showing that each of the three Defendants purposefully directed activity toward Vermont that gives rise to the claim at issue here.

On top of those foundational defects, the Complaint suffers from additional pleading failures.  The medical-monitoring statute provides that the owner or operator of a large facility is liable (i) only if the plaintiff's exposure to a toxic substance released from that facility was "significantly greater than [that of] the general population," (ii) only where the exposure occurred "as a result of" the owner's or operator's "tortious conduct," (iii) only where the exposure makes it "medically necessary" for the plaintiff to undergo medical monitoring, *and* (iv) only where the proposed monitoring is "reasonable in cost and safe for use."  Vt. Stat. Ann. tit. 12, § 7202(a).  The Complaint falls short on each of these four elements.

Lastly, even if Plaintiff could bring this claim on behalf of her three children, she lacks class standing under Article III to assert a claim on behalf of the absent putative class members— all students and adult staff members who attended or worked at any of the 26 schools that the Complaint lists.  The Complaint's allegations make clear that Plaintiff's claim will turn on different proof from the claims of absent class members, who attended or worked at different schools with different PCB levels, were different ages, and each had unique exposure histories.  At a minimum, then, the class claims should be dismissed for lack of class standing.

# BACKGROUND

## I.    Until 1977, Old Monsanto Manufactured PCBs in Out-of-State Facilities, Which Third-Party Manufacturers Incorporated into Their Own Finished Products.

From the mid-1930s to 1977, Old Monsanto manufactured PCBs.[2]  *See* Compl. ¶¶ 1, 20; EPA, Office of Toxic Substances, *Polychlorinated Biphenyls 1929-1979: Final Report*, at 2 (1979).[3]  PCBs are synthetic chemicals composed of carbon, hydrogen, and chlorine, and they differ from one another in consistency and use.  Compl. ¶ 18.  Because of their chemical properties, including their stability, PCBs were widely purchased and used by industrial companies, especially in the electrical industry.  *Id.* ¶¶ 20, 31.  PCBs were used in paints, caulks, adhesives, hydraulic fluids, transformers, capacitors, and varnishes.  *Id.* ¶ 31.  As the Complaint acknowledges, Old Monsanto did not manufacture the finished goods that included PCBs; it sold PCBs to other companies that elected to incorporate PCBs into their own finished products, which those companies then sold to end users.  *Id.* ¶¶ 29–31.  Old Monsanto manufactured PCBs in only two facilities, both outside Vermont:  one in Anniston, Alabama; the other in Sauget, Illinois.  *Id.* ¶ 30.

The Complaint alleges that if certain PCBs escape the finished products containing them, exposure to the PCBs above certain levels can pose risks to humans and the environment, and that these PCBs "persist in the body and bioaccumulate."  Compl. ¶ 26; *see id.* ¶¶ 21–26.  Much of the Complaint is geared toward insinuating that Old Monsanto knew of the dangers of PCBs but made a business decision not to reveal those dangers.  *See id.* ¶¶ 36–64.  But as the Complaint's own

---

[2] Though the Complaint defines the historical company whose conduct is at issue here as "Original Monsanto" and defines the named Defendants collectively as "Monsanto," Compl. p. 1; ¶ 10, it uses the term "Monsanto" in the allegations about the historical conduct relevant here, *see, e.g.*, *id.* ¶¶ 28–35.  But those allegations necessarily refer to Old Monsanto, as the Complaint makes clear that Defendants did not exist until the late-1990s.  *Id.* ¶ 11.

[3] The EPA report is judicially noticeable as a government record.  *See Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 299 n.7 (2d Cir. 2022) (courts "take 'routine' judicial notice of 'documents retrieved from official government websites'" (brackets omitted)).

allegations establish, knowledge about various PCBs and their risks changed significantly over time.  According to the Complaint, the risks associated with PCBs were first uncovered in the context of direct, extended exposure to PCBs by factory workers and animals.  *See*, *e.g.*, *id.* ¶¶ 36–38 (factory workers and animals with prolonged exposure); *id.* ¶ 40 (fabricators with direct exposure); *id.* ¶ 44 (inhalation "for 24 hours a day for 50 days" (quotation marks omitted)).  In the mid- and late-1960s, knowledge about PCBs and their ability to escape from different applications in third-party products allegedly increased.  *E.g.*, *id.* ¶¶ 46–48.  Even then, there was no immediate consensus about what action was needed.  In 1972, for example, an Interdepartmental Task Force composed of eight federal agencies and sub-agencies took the view that "use of PCBs should not be banned entirely," that "continued use of PCBs in transformers and capacitors presents a minimal risk of environmental contamination," that "[t]here currently are no toxicological or ecological data available to indicate that the levels of PCBs currently known to be in the environment constitute a threat to human health," and that "current scientific knowledge" from laboratory animal experiments was "often inadequate to allow reliable interpretation of the data" as to the "possible effects" of PCBs on humans.  EPA Interdepartmental Task Force on PCBs, *Polychlorinated Biphenyls and the Environment* 1, 3–5 (May 1972), https://bit.ly/498EsZ7.

Old Monsanto voluntarily ceased manufacturing PCBs at its Anniston plant in 1971 and at Sauget in 1977.  *See Polychlorinated Biphenyls 1929-1979: Final Report*, at 2; Compl. ¶ 1.  Two years later, the EPA banned the domestic manufacture of PCBs under the Toxic Substances Control Act.  *See* Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions, 44 Fed. Reg. 31,542 (May 31, 1979); *see also* Compl. ¶ 20.

## II.    In 2022, Vermont Created a Medical-Monitoring Claim Against Companies that Release Chemicals from Their Large Facilities into the Environment.

In 2022, the Vermont Legislature passed a medical-monitoring statute that provides "the

exclusive remedy for a person without a present injury to bring a cause of action to seek medical monitoring due to exposure to a proven toxic substance." Vt. Stat. Ann. tit. 12, § 7202(d)(1). As relevant here, § 7202(a) creates a cause of action for medical monitoring against "the owner or operator of a large facility from which a proven toxic substance was released." *Id.* § 7202(a). Even if a person has no "present injury or disease," he can hold the owner or operator of the facility liable for medical monitoring if he can prove: (i) exposure to the released substance "at a rate significantly greater than the general population," (ii) that the release was "a result of" the owner's or operator's tortious conduct, (iii) that the significant exposure "proximate[ly] result[ed]" in "an increased risk of contracting a serious disease," which makes it "medically necessary" to undergo atypical monitoring, and (iv) that monitoring is "safe" and "reasonable in cost." *Id.*

There is no indication that the Vermont Legislature had in mind PCBs, which the EPA banned in 1979, when it enacted this statute more than forty years later. Nor is there any indication that the Legislature intended to impose liability on manufacturers merely for lawfully making raw materials that third parties incorporate into finished products and then place into the stream of commerce. Instead, the Vermont Legislature was focused on companies with active factory operations in Vermont that were discharging chemicals directly into the environment. One case, in particular, served as the impetus for the bill: In 2016, Vermont residents sued Saint-Gobain Performance Plastics Corp., a manufacturing company that operated "facilities in Bennington and North Bennington" and allegedly "discharge[d]" perfluorooctanoic acid (PFOA) from those facilities "into the soil and water, causing environmental contamination around the facility, including contamination of the local groundwater aquifer and numerous private drinking water wells." *Sullivan v. Saint-Gobain Performance Plastics Corp.*, 226 F. Supp. 3d 288, 291–92 (D. Vt. 2016). The district court denied Saint-Gobain's motion for summary judgment, predicting that

Vermont courts would recognize the plaintiffs' medical-monitoring claim under Vermont common law and holding that such a claim was "supported by the particular facts" of that case.  *See Sullivan v. Saint-Gobain Performance Plastics Corp.*, 431 F. Supp. 3d 448, 450, 466–67 (D. Vt. 2019).

When it was proposed and passed, the medical-monitoring bill was widely understood to codify the *Sullivan* decision, with a few adjustments.  The Vermont Office of Legislative Counsel submitted into the legislative record a document explaining that the elements set out in the *Sullivan* opinion were nearly co-extensive with the proposed legislation, *see Comparison of Medical Monitoring Elements*, VT LEG #359633 v. 1 (Jan. 19, 2022), https://bit.ly/4arIjSt, and others (both legislators and otherwise) similarly commented on the intentional overlap.[4]  But one of the "[k]ey [d]ifferences," the Office of Legislative Counsel noted, was that the remedy available under *Sullivan* would have allowed a plaintiff to sue any person who allegedly exposed the plaintiff to hazardous materials.  *Id.* at 2.  By contrast, the medical-monitoring bill provided that "medical monitoring may be sought under the statute only against the owner or operator of a large facility from which the toxic substance was released."  *Id.*  Vermont thus acted to address a particular problem—the ongoing and future discharge (*i.e.*, "release") of chemicals like PFOA from local facilities directly into Vermont.  The language in the statute reflects that focus.

## III.    Plaintiff Brings a Suit that Would Dramatically Expand the Medical-Monitoring Statute.

In September 2023, Plaintiff filed suit under § 7202 on behalf of her three children, Z.N., C.B., and A.B.  Compl. at p.1, ¶ 8.  She sued Monsanto Company, Solutia Inc., and Pharmacia

---

[4] *See* Emma Cotton, *Scott Signs Medical Monitoring Bill into Law*, VTDigger (Apr. 21, 2022), https://bit.ly/42a2yQQ (Senator Sears's comments); Jim Therrien, *$34M Settlement Agreement Reached in Bennington PFOA Suit*, Bennington Banner (Nov. 11, 2021), https://bit.ly/3GPYhYP (Senator Sears noting publicly that medical-monitoring statute was being introduced to address cases analogous to PFOA releases from Saint-Gobain facility); Letter for Senators from Conservative Law Foundation (Jan. 26, 2022), https://bit.ly/3v6LYVJ ("This bill has been carefully crafted to closely track" *Sullivan* test).

LLC.  *Id.*  ¶¶ 9–13.  She admits, however, that each of the Defendants is organized and headquartered outside Vermont.  *Id.* ¶¶ 8–13.  And she does not allege that any Defendant (or Old Monsanto) has ever had a factory or other facility in Vermont.

Plaintiff seeks medical monitoring for her children under § 7202.  Compl. ¶ 7.  She alleges that her children attended the Cabot School in Cabot, Vermont, a pre-K through 12th grade school that allegedly measured PCB levels above the school action levels that Vermont has promulgated to monitor PCBs in its schools.  *See id.* ¶¶ 74–76.  According to the Complaint, Vermont's school action levels reflect that PCBs pose different risks at different concentration and exposure levels for people of different ages; there is no claim in this case that any level of PCB exposure always poses a risk to human health.  *Id.* ¶ 75.  Indeed, even when a school's results are at or above the school action levels, the State does not require immediate action—the State can, if it chooses, require a school to take remedial measures, or it may decide not to do so.  *See* Vt. Dep't of Env't Conservation, *PCBs in Schools*, https://bit.ly/3vSYRTo (last visited Jan. 29, 2024).  Plaintiff nevertheless alleges that her children's exposure puts them at increased risk of "developing PCB-related health consequences, including developing certain cancers."  Compl. ¶ 86.  But she does not allege when her children attended the Cabot School, what ages they were when they attended, or other particular facts regarding the extent to which they were allegedly exposed to PCBs.[5]

Although Plaintiff alleges that the "Cabot School has . . . been contaminated with PCBs at a concentration of 210 ng/m$^3$," Compl. ¶ 80, the public data on which the Complaint relies reveals that Plaintiff is not telling the whole story.  The initial testing on which the Complaint relies

---

[5] Vermont's school action levels are considerably more stringent than the EPA's indoor-air exposure levels for PCBs in schools, which are themselves "health protective values" that "should not be interpreted nor applied as 'bright line' or 'not-to-exceed' criteria."  EPA, *Exposure Levels for Evaluating Polychlorinated Biphenyls (PCBs) in Indoor School Air*, https://bit.ly/48K7Y7x (last visited Jan. 29, 2024).

showed elevated levels in only seven specific places in the Cabot School:  an art room, a storage closet, the gymnasium, and a locker room, two storage areas, and stage within the gym.  *See* Vt. Agency of Nat. Res., *PCB: Cabot School*, https://bit.ly/3SrkALc (last visited Jan. 29, 2024).[6]  The 210 ng/m$^3$ figure was the highest number found in *any* of those locations.  *Id.*  Further, the School Board has since recognized that these initial results were unrepresentative.   In the Board of Directors' meeting minutes, which are judicially noticeable, *see Vill. Green*, 43 F.4th at 299 n.7, the Board acknowledged that the original testing was conducted at the end of the summer, when the buildings' ventilation systems had been switched off for several months, *see "Approved" Cabot School District Board of Directors' Board Meeting* 2 (Oct. 24, 2022), https://bit.ly/41yddEG.  A new round of testing revealed materially lower levels of PCBs, and the Board concluded that the gym—the area with the highest first-round results—could be reopened.  *Id.*

    In addition to suing on behalf of her own children, Plaintiff seeks to bring this case on behalf of a putative class of all "students and school staff who have been exposed to high levels of PCBs" at a list of 26 schools scattered across the State that the Complaint deems contaminated based on reports of allegedly high test results.  Compl. ¶¶ 7, 68–69, 88.  Plaintiff does not allege that she works at one of the schools, however, and she overstates the number of schools that exceed the school action levels.[7]

_____

[6] The entirety of the school testing results from the initial August 2022 survey is incorporated by reference into the Complaint and can be considered at this stage.  *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").  The results are also judicially noticeable as a government record.  *See Vill. Green*, 43 F.4th at 299 n.7.

[7] Though the Complaint lists 26 schools as "Contaminated," Vermont's Agency of Natural Resources did not identify elevated PCB levels at 9 of those schools:  Academy School, Alburgh Community Education Center, Bellows Free Academy, Bethel Elementary and White River Middle School, Brownington Central School, Monument Elementary, Shaftsbury Elementary, and

**ARGUMENT**

**I.    This Court Lacks Personal Jurisdiction over Defendants**

The Complaint does not allege any facts supporting the exercise of personal jurisdiction over any of the Defendants.  Accordingly, the Complaint should be dismissed under Rule 12(b)(2).

To establish personal jurisdiction at the pleading stage, Plaintiff must allege specific facts that, if true, would support jurisdiction.  *Lelchook v. Société Générale de Banque au Liban SAL*, 67 F.4th 69, 75 (2d Cir. 2023).  The Court does not accept "conclusory non-fact-specific jurisdictional allegations" as true, even where they are "'couched as a factual allegation.'"  *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998).

Federal due process forbids courts from exercising personal jurisdiction over a defendant unless the plaintiff establishes that the defendant has sufficient "minimum contacts" with the forum state.  *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  None of the Defendants (nor Old Monsanto) is alleged to be at home in Vermont:  Defendants are Delaware companies headquartered in Missouri and New Jersey, Compl. ¶¶ 9, 12–13.  Accordingly, Plaintiff must allege facts establishing that the suit "aris[es] out of or relat[es] to" Defendants' "contacts with the *forum*."  *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017) (quotation marks omitted).  A defendant must "take some act by which it purposefully avails itself of the privilege of conducting" suit-related "activities" in the state, like "d[oing] substantial business" there.  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1022, 1024–25 (2021) (brackets and quotation marks omitted).

The Complaint does not allege facts sufficient to establish personal jurisdiction over Defendants.  The Complaint says only that Defendants purportedly "transact business in this

---

Waterford Elementary.  *See* Vt. Agency of Nat. Res., *PCB in Schools*, https://bit.ly/42bSff3 (last visited Jan. 30, 2024).

District," without elaboration.  Compl. ¶ 17.  That conclusory allegation is clearly insufficient.  The Complaint does not say what kind of business any of the Defendants allegedly transacts in Vermont or whether that business has anything to do with PCBs or the claim in this case.  In fact, Plaintiff admits that two of the three Defendants work in pharmaceuticals and agriculture, rather than chemicals, *id.* ¶ 11, and that none of the Defendants was even formed until 1997—nearly 20 years after the EPA banned domestic PCB manufacturing, *id.* ¶¶ 11, 20.  Without allegations that any Defendant purposefully directed PCB-related activity to Vermont that gives rise to the claim in this case, Plaintiff has not shown that this Court can exercise personal jurisdiction over any Defendant based on its alleged contacts with Vermont.

The Complaint also does not include any allegations that Old Monsanto purposefully directed activity toward Vermont.  While the Complaint alleges that "PCBs *were used* in building materials and electrical equipment in Vermont schools," Compl. ¶ 65 (emphasis added), there is no allegation that Old Monsanto made those PCB-containing finished products, sold them to customers in Vermont, or installed them in Vermont schools.  In fact, the Complaint makes clear that Old Monsanto's "customers" were *third-party* manufacturers that decided to use PCBs in finished products like paint, caulk, and light fixtures.  *Id.* ¶ 31.  Other third parties then purchased those products and used them "in Vermont schools."  *Id.* ¶ 65.  Bare allegations that Old Monsanto manufactured chemicals (in Alabama and Illinois) that were used in products that eventually found their way to Vermont do not establish that Old Monsanto itself had purposeful contact with Vermont that gave rise to Plaintiff's claim.  *Ford*, 141 S. Ct. at 1024–25.

This Court should dismiss the Complaint for lack of personal jurisdiction.

## II.    The Complaint Fails to State a Claim Under Rule 12(b)(6)

The Court should also dismiss the Complaint because it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A court should dismiss a complaint that does not

"contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To state a plausible claim, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A pleading "'will not do'" if it offers only "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

Plaintiff has not stated a claim under the medical-monitoring statute for each of several independent reasons.  First, the medical-monitoring provision does not apply because Plaintiff does not allege that her children were exposed to a toxic substance "released" "from" an Old Monsanto "large facility," as the statute's plain terms require—Old Monsanto's PCB factories were located outside Vermont and are not alleged to have released PCBs directly into the environment.  Vt. Stat. Ann. tit. 12, § 7202(a).  Second, even if the statute did apply, it cannot impose liability retroactively for Old Monsanto's decades-ago manufacture and sale of PCBs. And, third, Plaintiff fails to plead facts supporting other essential elements of her claim, including tortious conduct committed by Old Monsanto that caused her children's exposure to PCBs, exposure to PCBs at "significantly greater" rates than the general population, and that medical monitoring is necessary or reasonable in cost.

## A.    By Its Terms, § 7202 Unambiguously Applies Only to the Release of Toxic Substances from "Large Facilities" Directly into the Environment

Plaintiff's Complaint suffers from a fundamental flaw:  § 7202 does not afford a cause of action for the lawful sale of chemicals to a third party for use in a finished product.  Section 7202 provides a cause of action for medical monitoring only against "the owner or operator of a large facility from which a proven toxic substance was released."  Vt. Stat. Ann. tit. 12, § 7202(a).  The text and statutory history make clear that a substance is "released" "from" a facility when it is

11

emitted directly from that facility into the environment. The Complaint makes no such allegation—it alleges only that Old Monsanto manufactured PCBs at factories in Alabama and Illinois and sold the PCBs to third parties. Section 7202 thus does not apply here by its own terms.

This Court's "primary objective" in interpreting statutory language "is to effectuate the Legislature's intent," and courts "presume that the Legislature intended the plain, ordinary meaning of the statutory language." *Shires Hous., Inc. v. Brown*, 172 A.3d 1215, 1219 (Vt. 2017) (quoting *Wesco, Inc. v. Sorrell*, 865 A.2d 350, 355 (Vt. 2004)). Here, the statute defines all relevant terms, so the Court must give effect to those definitions. *See Digit. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776–77 (2018). A "[f]acility" refers to "all contiguous land, structures, other appurtenances, and improvements on the land where proven toxic substances are manufactured, processed, used, or stored"—in short, a "facility" is a factory or similar physical location. Vt. Stat. Ann. tit. 12, § 7201(4). A "[l]arge facility" is a facility where certain industrial activities are conducted and where at least 10 employees were simultaneously employed or that is owned or operated by an entity that has 500 total employees. *Id.* § 7201(5). Finally, the statute defines the term "[r]elease" to refer to "any act or omission that allows a proven toxic substance to enter the air, land, surface water, or groundwater." *Id.* § 7201(11).

These provisions together make clear that medical monitoring is available against the owner or operator of a large facility only when the plaintiff is exposed to toxic substances that were tortiously "released" into the environment directly "*from*" that facility. Vt. Stat. Ann. tit. 12, § 7202(a) (emphasis added). The verb "released" refers to the actual process by which a toxic substance "enter[ed] the air, land, surface water, or groundwater." *Id.* § 7201(11); *see also* Black's Law Dictionary 672 (11th ed. 2019) ("enter" means "[t]o come or go into"). So a toxic substance cannot be "released" "from" a "large facility" unless it "enter[s] the air, land, surface water, or

12

groundwater" "from" that facility.  Vt. Stat. Ann. tit. 12, §§ 7201(4)–(5), (11), 7202(a).  Examples might include sludge discharged from a plant into a river or waste buried in the soil.

The Complaint makes no such allegation.  The gravamen of Plaintiff's claim is that her children were exposed to PCBs at the Cabot School because PCBs escaped from "building materials and electrical equipment" manufactured by third parties, including "caulk, fluorescent light ballasts, sealants, glazing, and flooring adhesives."  *See* Compl. ¶¶ 5, 65, 85–86.  According to the Complaint, these finished products allowed PCBs to "leach, leak, off-gas, and escape" into Vermont schools.  *Id.* ¶ 65; *see id.* ¶ 21.  Absent from the Complaint is any allegation that her children were exposed to PCBs released from Old Monsanto's factories.  Nor could the Complaint credibly make such an allegation:  As Plaintiff admits, Old Monsanto's manufacturing of PCBs occurred "at two large facilities in the United States," one in Alabama and the other in Illinois.  *Id.* ¶ 30.  Plaintiff does not allege that Old Monsanto manufactured PCBs in Vermont, or that its Alabama or Illinois facilities somehow "released" PCBs into Vermont schools.  Because the Complaint focuses exclusively on PCBs escaping from finished products, and because § 7202(a) creates a "cause of action" only against a person who "release[s]" toxic substances "from" a "large facility," Plaintiff does not state a claim.

Plaintiff makes only one allegation speaking to these elements of § 7202, asserting (confusingly):  "Defendants released PCBs from one or more of its [*sic*] large facilities and PCBs entered the air and accumulated in the dust of the Contaminated Schools."  Compl. ¶ 99.  That conclusory statement is plainly inadequate—it does not suggest in any legally sufficient way that Old Monsanto's factories in Alabama or Illinois somehow released PCBs directly into the environment and that the PCBs then traveled hundreds of miles to Vermont and came to rest in Vermont schools.  Any such suggestion would be especially implausible in light of Plaintiff's other

13

allegations that Old Monsanto's only relevant conduct was the out-of-state manufacture and sale of PCBs to third-party manufacturers, and that the source of PCBs in Vermont schools was PCB-containing finished products that were manufactured and installed by third parties. *Id.* ¶¶ 5, 29–31, 65; *see Iqbal*, 556 U.S. at 678, 682. To the extent Plaintiff is proposing to stretch the statute to encompass PCB leakage from a finished product manufactured and installed by a third party, the statutory definitions prohibit that maneuver. The statute applies only to the "owner or operator of a large facility from which a proven toxic substance was released," and it clearly provides that a "facility" or "large facility" refers to factories and other physical locations where toxic substances "are manufactured, processed, used, or stored," and where people are "employed"—not to finished products. Vt. Stat. Ann. tit. 12, § 7201(4)–(5); *see id.* (defining facilities by reference to "land," "structures," "appurtenances," "treatment, storage, or disposal operational units," and places where industrial activity "is conducted" and people are "employed"). The statute is similarly clear that a "release" is the actual entrance of the substance into "the air, land, surface water, or groundwater." *Id.* § 7201(11). Thus, the statute only applies to a direct release "from" a facility into the environment. The statute does not cover an out-of-state manufacturer of a raw material whose only relevant conduct is lawfully selling that material for use in a third party's finished product.

By contrast, Plaintiff's theory—that PCBs are "released" "from" a "large facility" anytime a chemical that was originally manufactured in that facility escapes from a finished product, even decades in the future—would render the statutory language limitless and stretch it far beyond what the text can bear. *Cf. DVL, Inc. v. Niagara Mohawk Power Corp.*, 490 F. App'x 378, 383 (2d Cir. 2012) (explaining that a company's "activities at its Fort Edward manufacturing plant . . . do not constitute 'evidence that [the company] disposed of PCBs at [a different site]'"). The connection between Old Monsanto's manufacturing plants and the presence of PCBs in the air in Vermont's

schools is highly attenuated at best: (1) Old Monsanto originally manufactured PCBs at facilities in Alabama and Illinois, (2) Old Monsanto then lawfully sold and shipped those PCBs to other companies, (3) those other companies used PCBs in certain industrial and commercial products, (4) those other companies sold the PCB-containing products to still other third parties, (5) those third parties installed PCB-containing products in some schools in Vermont, (6) those products were not replaced after PCB manufacturing was banned, and (7) eventually, those products emitted PCBs.  Compl. ¶¶ 29–32, 65.  To explain Plaintiff's theory of liability is to refute it; the statutory language contemplates nothing close to that lengthy chain of liability.  By its terms, § 7202(a) provides a cause of action only against the owner or operator of a "large facility" that tortiously "release[s]" toxic substances "from" that facility into the environment.[8]

Other courts have reached the same conclusion—that a company is not liable for selling a product to a third-party manufacturer for use in a finished product—in the analogous context of laws regulating the disposal of hazardous substances.  "The sale of a useful product does not constitute the 'handling, storage, treatment, transportation, or disposal of any solid waste or hazardous waste.'"  *United States v. Union Corp.*, 277 F. Supp. 2d 478, 491 (E.D. Pa. 2003).  And, as the Ninth Circuit has noted, courts "have construed 'disposal'" not to include "the productive use of the substance," such as sales of the substance as a product.  *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1362 (9th Cir. 1990).  That reasoning applies with equal force to the "release" of a substance.

---

[8] As part of the same legislation that created the medical-monitoring cause of action, the Vermont Legislature amended the Waste Management Act—which permits the State, not private plaintiffs, to bring suit—to make "any person who manufactured for commercial sale a hazardous material" a party potentially responsible for "a release or threatened release of hazardous materials."  Vt. Stat. Ann. tit. 10, § 6615(a)(5).  That language is noticeably absent in § 7202, which provides further evidence that § 7202 does not reach Old Monsanto.  *See Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) ("differences in language . . . convey differences in meaning").

Because the statutory text is clear, there is no need to proceed further.  *Shires Hous.*, 172 A.3d at 1219.  But if the Court does so, it will find that the "circumstances surrounding [the] statute's enactment" and the "evidence of the legislative policy at which the statute was aimed" defeat Plaintiff's view of § 7202.  *Id.*  As explained above, the medical-monitoring statute was a response to Saint-Gobain's direct release of a toxic chemical from its Bennington and North Bennington facilities "into the soil and water" surrounding those facilities.  *Sullivan*, 226 F. Supp. 3d at 292; *see supra*, at 5–6.  Legislators and commentators emphasized that the statute tracked the court's analysis in the ensuing litigation and was intended to codify it, with slight modifications.  *Supra*, at 5–6 & n.4.  That historical background confirms what is evident from the text of the statute—that when the Legislature enacted § 7202, its purpose was to codify the court's decision in *Sullivan* by providing a medical-monitoring claim, but only against the owners and operators of large facilities (such as factories) that directly release toxic substances into the environment.  It was not intended to create a sweeping new form of perpetual, open-ended product liability for each and every manufacturer of a chemical component that is incorporated into a third party's finished product and that, decades later, is emitted from that product.

In short, the Complaint fails to allege that Old Monsanto (or Defendants) owned or operated a "facility from which" PCBs were "released."  Vt. Stat. Ann. tit. 12, § 7202(a).  Any releases occurred when PCBs allegedly escaped their applications in caulk, lighting, or other finished products manufactured by third parties and installed in Vermont schools by other third parties.  Those products (and Vermont schools) are not "large facilities," *see id.* § 7201(4)–(5), and Old Monsanto did not own or operate those products or the schools at which they were installed.  The Complaint thus fails to state a claim.

**B.      Section 7202 Does Not Apply Retroactively, so Defendants Cannot Be Liable for Old Monsanto's Decades-Old Conduct**

Even if § 7202 applied on its face, it would not impose liability for Old Monsanto's long-past conduct.  In Vermont, new laws generally apply only prospectively unless the Legislature "unequivocally express[es]" an intent that they apply retroactively.  *A.B. v. S.U.*, 298 A.3d 573, 580 (Vt. 2023) (quoting *Lowry v. Keyes*, 14 Vt. 66, 74 (1842)).  That rule is rooted in "[b]oth statutory law and case law."  *State v. Willis*, 494 A.2d 108, 112 (Vt. 1985).  In addition to judicial precedents establishing the non-retroactivity principle (based in part on due-process concerns), "[t]he Legislature has explicitly adopted a general prohibition against retroactive construction of statutes in 1 V.S.A. § 214."  *A.B.*, 298 A.3d at 580; *see* Vt. Stat. Ann. tit. 1, § 214.  Applied here, that means Defendants cannot be held liable for Old Monsanto's decades-old conduct under Vermont's 2022 medical-monitoring statute because that statute has no explicit retroactive effect.

As Old Monsanto ceased production of PCBs more than 40 years ago, any application of § 7202 to Old Monsanto (and thus Defendants) would necessarily be retroactive as a matter of law.  Laws are "retroactive" if they "take away or impair vested rights acquired under existing laws, or create a new obligation, impose a new duty, or attach a new disability in respect to transactions or considerations already past."  *Carpenter v. Vt. Dep't of Motor Vehicles*, 465 A.2d 1379, 1382 (Vt. 1983) (quotation marks omitted).  "[T]he essential inquiry," then, "is whether 'the act which triggers application of the amended statute occurs after the effective date of the amended statute.'"  *Id.*  Here, the act that triggers application of § 7202 is the tortious release of a toxic substance from a large facility into the environment.  *See* § 7202(a).  Even accepting for purposes of this argument the Complaint's erroneous assumption that Old Monsanto "released" PCBs from its Alabama and Illinois factories within the meaning of § 7202 when it lawfully sold PCBs to third-party manufacturers, *see* Compl. ¶¶ 30–31, 97–99; *but see supra*, at 11–16, that conduct all indisputably

occurred decades ago.  Plaintiff admits that Old Monsanto ceased manufacturing PCBs by 1979. *See* Compl. ¶¶ 10, 20, 29, 35.  Applying § 7202 to Old Monsanto would thus "'create a new obligation, impose a new duty, [and] attach a new disability'" to conduct (so-called "releases") that occurred decades ago and thus is "'already past.'"  *Carpenter*, 465 A.2d at 1382.

For § 7202 to apply to Old Monsanto, then, the statute must contain explicit retroactive language—and it does not.  Nothing in the text of the medical-monitoring statute so much as hints that the provision would apply to releases that occurred before its adoption.  That is far from the "unequivocally express" language that Vermont law requires.  *A.B.*, 298 A.3d at 580 (brackets and quotation marks omitted).  And the Legislature knows how to use such language when it wants a new statutory provision to apply retroactively.  Indeed, it (controversially) used such language in a neighboring section of the very same legislation that created the medical-monitoring provision. *See* 2022 Vt. Act No. 93.  Section 1 of the legislation created the medical-monitoring cause of action at issue here.  *See id.* § 1.  Section 2 amended a different Vermont statute related to releases of hazardous materials, Vt. Stat. Ann. tit. 10, § 6615, that is enforceable by the State.  *See* 2022 Vt. Act No. 93, § 2.  Section 3 then provides that, notwithstanding the general prohibition against retroactive laws in "1 V.S.A. § 214," the amendment to § 6615 "shall apply to any relevant release of a hazardous material regardless of the date of the relevant release, including releases that occurred prior to the effective date of" the amendment.  2022 Vt. Act No. 93, § 3.  That provision of § 6615 raises serious due-process concerns, but the relevant point for present purposes is that there is no similar, explicitly retroactive language for § 7202.  The "differences in language" between these two provisions in the same Act "convey differences in meaning," *Henson*, 582 U.S. at 86, confirming that § 7202 does not apply retroactively.

Because the medical-monitoring statute does not apply retroactively to Old Monsanto's decades-old conduct, the Complaint fails to state a claim against Old Monsanto (or Defendants).

### C.      The Complaint Fails to Satisfy Other Statutory Requirements

In addition to those two defects, Plaintiff also fails to plead facts supporting essential elements of her claim.

#### 1.      The Complaint Fails to Allege Tortious Conduct or Causation

Section 7202 requires that a plaintiff's exposure to a toxic substance come "as a result of tortious conduct of the defendant."  Vt. Stat. Ann. tit. 12, § 7202(a)(3).  The statute defines "tortious conduct" as "negligence, trespass, nuisance, product liability, or common law liability for ultra-hazardous or abnormally dangerous activity."  *Id.* § 7201(12).  But the Complaint never identifies a tort that Old Monsanto allegedly committed, let alone that its elements are satisfied.

When one element of a cause of action is that the defendant committed a tort, the Complaint must sufficiently allege that the elements of that tort are satisfied.  *See Buxton v. Springfield Lodge No. 679, Loyal Ord. of Moose, Inc.*, 99 A.3d 171, 176 (Vt. 2014) ("[a]lleging respondeat superior based on tort . . . requires a prima facie showing of all elements of the agent's tort, including the agent's legal duty"); *see also Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 128 (2d Cir. 2023) ("To state a claim for conspiracy to commit fraud, a plaintiff must allege both a primary fraud tort as well as the four elements of conspiracy.").  To plead a claim under § 7202, then, a Complaint must allege which of the six enumerated torts under § 7201(12) the defendant is alleged to have committed *and* facts sufficient to establish liability for that particular tort.  For example, to plead a trespass claim, the plaintiff must allege exclusive possession of land.  *John Larkin, Inc. v. Marceau*, 959 A.2d 551, 553 (Vt. 2008).  Negligence requires a duty.  *Fleurrey v. Dep't of Aging & Indep. Living*, 292 A.3d 1219, 1222, 1224 (Vt. 2023).  And a nuisance claim requires showing

an unreasonable and substantial "interference with the use and enjoyment of" property.  *Coty v. Ramsey Assocs., Inc.*, 546 A.2d 196, 201 (Vt. 1988).

The Complaint falls well short.  It simply recites that Old Monsanto "acted tortiously." Compl. ¶ 100.  There is no indication which tort Old Monsanto allegedly committed—the Complaint neither names a specific tort nor alleges facts establishing the elements of that tort. With no indication of what tort Old Monsanto allegedly committed, or how the elements of that tort are satisfied, Defendants lack notice of what they allegedly did wrong and cannot respond. The Complaint's allegations of various facts about PCBs or Old Monsanto's knowledge of PCBs do not suffice.  *Cf. Montanio v. Keurig Green Mountain, Inc.*, 276 F. Supp. 3d 212, 223 (D. Vt. 2017) ("Judges are not like pigs, hunting for truffles buried in" parties' filings (citation omitted)).

Moreover, one requirement of each of the torts listed in § 7201(12) is causation.  Causation has a but-for causation element and a proximate-causation element.  *State v. Baker*, 177 A.3d 1093, 1098 (Vt. 2017).  Whereas but-for causation is satisfied when an injury "would not have occurred 'but for' the defendant's conduct," proximate cause's "hallmark feature," and "what distinguishes it from but-for causation, is reasonable foreseeability."  *Id.* (quotation marks omitted).  A defendant can therefore be liable only for a harm that "ought to have been foreseen" or "was reasonably foreseeable."  *Id.* (quotation marks omitted).

Plaintiff alleges no facts suggesting that Old Monsanto could reasonably have foreseen that PCBs it manufactured in Alabama or Illinois and sold to third parties would be incorporated into PCB-containing products that would end up in Vermont and, decades later, be allowed to release PCBs in schools at such a level that there would be an increased risk of serious disease.  Plaintiff alleges that there are different kinds of PCBs with different properties, and those PCBs were used in a wide variety of products.  Compl. ¶ 18.  The Complaint offers no basis for concluding that

Old Monsanto would have reasonably foreseen when it sold PCBs to third-party manufacturers how PCBs might eventually be used (and allowed to remain) in Vermont, much less in a Vermont school, decades later.  Moreover, knowledge about PCBs grew over time; according to the Complaint, it was not until the mid-1960s that scientists allegedly knew that PCBs could escape from their applications in finished products.  *See id.* ¶¶ 53, 64.  Accordingly, Plaintiff must at least allege when the PCBs in the PCB-containing products in the Cabot School were manufactured and sold.  The Complaint never alleges which of the more than 200 PCB congeners was present at the Cabot School, how they were being used, who manufactured or installed the PCB-containing products, when those products were installed, or when they were manufactured.  Without that basic information, the Complaint fails to show that any exposure to PCBs was proximately caused by Old Monsanto's purportedly tortious conduct.

### 2. The Complaint Fails to Allege Exposure to PCBs "at a Rate Significantly Greater" than the General Population

The Complaint also fails to allege that anyone was exposed to PCBs "at a rate significantly greater than the general population."  Vt. Stat. Ann. tit. 12, § 7202(a)(1).  A person's total exposure rate or level is the product of time and concentration.  *See, e.g.*, *Bourgeois v. A.P. Green Indus., Inc.*, 716 So. 2d 355, 360 (La. 1998).  Plaintiff must plead that her children were exposed at a "significantly greater" rate, meaning the higher rate must be sizable or of particular import.  *See Significant*, Black's Law Dictionary 1662 (11th ed. 2019) ("Of special importance; momentous"); *Significant*, American Heritage Dictionary 768 (5th ed. 2012) ("Having a major effect; important").  The Complaint fails to allege facts supporting that element.

Plaintiff has painted a misleadingly incomplete picture about the PCB levels at the Cabot School based on initial tests that the Board of Directors has publicly acknowledged are inaccurate.  *See supra*, at 7–8.  And even those results found PCB levels above Vermont's school action levels

only in a few specific areas of the school: an art room, a storage closet, and places associated with the school gym.  Those allegations are not sufficient to plead that Plaintiff's children were exposed to PCBs at a rate significantly greater than the general population.  The Complaint nowhere asserts how long Plaintiff's children attended the Cabot School, how often they visited the affected areas, or how long they were in the affected areas.  Further, the Complaint fails to assert the typical exposure levels for the "general population," which makes any comparison to determine whether the children's exposure was "significantly greater" impossible—a particularly glaring omission given the widespread use of PCB-containing products throughout the mid-1900s.

### 3. The Complaint Fails to Allege that Medical Monitoring is Necessary or Reasonable in Cost

Plaintiff must also allege that non-standard medical monitoring is both "medically necessary" and "reasonable in cost and safe for use."  Vt. Stat. Ann. tit. 12, § 7202(a)(5)–(6).  Plaintiff alleges neither.

The Complaint cites several studies for the proposition that the alleged increased risk to Plaintiff's children means that testing is medically necessary, but those studies are inapposite.  The recommendations from the National Institute of Occupational Safety and Health ("NIOSH"), *see* Compl. ¶ 81, are based on exposure levels *ten times higher* than even the highest Vermont school action levels and almost five times higher than the highest level found during the first (unrepresentative) test at the Cabot School.  NIOSH, *Polychlorinated Biphenyls (PCB's): Current Intelligence Bulletin 45* (Feb. 1986), https://bit.ly/3RPK98h.  The Complaint also cites generic recommendations from the New Jersey Department of Health, but they apply only to "potentially high exposures," Compl. ¶ 82, and the data on which they are based—from NIOSH, the Occupational Safety and Health Administration, and the American Conference of Governmental Industrial Hygienists—contemplates exposure much higher than that alleged here.  *See* N.J. Dep't

of Health, *Hazardous Substance Fact Sheet*, https://bit.ly/3HtsNYP (last visited Jan. 29, 2024)

(incorporated by reference in ¶ 82 of the Complaint).  The *lowest* level cited in that guidance comes

from NIOSH, which as explained is based on much higher exposure levels than those alleged at

the Cabot School.  The fact that limited medical monitoring is recommended for exposure levels

an order of magnitude greater than those found at the Cabot School does nothing to demonstrate

that exposure at levels far less than the public health guidelines requires medical monitoring.

As to cost, the Complaint offers only a naked repetition of the element:  "Monitoring

procedures, such as blood serum measurements, tissue sampling, and evaluation of skin, liver, and

nervous systems, exist and are reasonable in cost and safe for use."  Compl. ¶ 104.  Plaintiff does

not provide any information that would give an indication of the price of those procedures.

"Threadbare recitals" like that "do not suffice."  *Iqbal*, 556 U.S. at 678.  For these reasons, too,

the Complaint therefore fails to state a claim.

## III.    Plaintiff Lacks Standing to Assert Claims on Behalf of Absent Class Members

Finally, even if Plaintiff had plausibly alleged personal jurisdiction over Defendants and

stated a claim for medical monitoring as to her three children, she would lack standing to bring

claims on behalf of a putative class of adult staff members and other children, especially those of

different ages, in other classes, and at other schools.  A named plaintiff has standing to litigate

claims on behalf of a class only if she plausibly alleges that she has "a sufficiently personal and

concrete stake in proving *other*, related claims against the defendant."  *Ret. Bd. of the Policemen's*

*Annuity & Benefit Fund v. Bank of N.Y. Mellon*, 775 F.3d 154, 163 (2d Cir. 2014) (emphasis

added).  Her claims and the class's must implicate "'the same set of concerns'"—a requirement

that is not met as a matter of law when there will be "significant differences in the proof that will

be offered" to support the named plaintiff's own claim and the putative class members' claims.

*Id.* at 161, 163 (quoting *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d

145, 162 (2d Cir. 2012)).  This principle "derives from constitutional standing principles" under Article III and is "distinct" from the adequacy inquiry under Rule 23(a).  *Id.* at 161.

In *Policemen's Fund*, for example, the named plaintiffs lacked standing to assert classwide claims against the trustee of 530 mortgage-based security trusts originated by the same mortgage company, even though the plaintiffs (who had invested in 26 of them) alleged that the trustee had a single "policy of 'inaction'" that was "applicable to all of the trusts at issue."  775 F.3d at 162; *see id.* at 156–57.  Notwithstanding those commonalities, the trustee's duty to act and any alleged breach would have needed to be "proved loan-by-loan and trust-by-trust," *id.* at 162, "unavoidably generat[ing] significant differences in the proof that w[ould] be offered," *id.* at 163.

So too here—Plaintiff's claim would not implicate "the same set of concerns" as the putative absent class members' claims.  Based solely on the alleged PCB exposure of her three children at a single school, Plaintiff seeks to sue on behalf of every person who attended or worked at 26 different schools across Vermont.  The differences between Plaintiff's children and other putative class members would lead to inevitable and important "differences in the proof that w[ould] be offered."  *Policemen's Fund*, 775 F.3d at 163.

First, for those who attended or worked at other schools, the proof would obviously differ from Plaintiff's evidence regarding the Cabot School.  Plaintiff has no concrete stake in developing the evidence necessary to show PCB levels at schools that her children did not attend, what areas of those schools had elevated levels, and how much (if any) time absent class members spent in those areas—all of which is irrelevant to Plaintiff's claims for her own children.  Indeed, nine of the schools that Plaintiff alleges are contaminated are not even listed as having elevated PCB levels on the State of Vermont's website.  *See supra*, at 8 & n.7.  The proof offered by students or staff at different schools would thus differ.

The proof will also vary from person to person.  The Complaint alleges that PCB risks are linked to age, Compl. ¶¶ 73–76, such that staff—that is, adults—fall into a risk category distinct from younger students.  Plaintiff's claims on behalf of her children give her no concrete interest in additionally meeting the higher evidentiary bar applicable to adults.  The statute also makes level of exposure relevant.  So each student or staff member—including other students who attended the Cabot School—would need to prove his age, how long he attended or worked at the school, and how long he was in allegedly contaminated areas of the school.  Plaintiff, whose only concrete interest in this case is tied to her three children, has no interest in expending time and resources to adduce the individualized evidence necessary to prove the claims of absent putative class members.  Because Plaintiff lacks a "sufficiently personal and concrete stake in proving" other putative class members' claims based on different proof, she should not be "the one to litigate" their claims.  *Policemen's Fund*, 775 F.3d at 163; *see Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit").  Thus, if this Court has any reason to reach the class claims, it should dismiss them for lack of standing under Rule 12(b)(1).

## CONCLUSION

This Court should dismiss the Complaint for lack of personal jurisdiction under Rule 12(b)(2) and, alternatively, for failure to state a claim under Rule 12(b)(6).  At a minimum, the Court should dismiss the claims of absent class members for lack of jurisdiction under Rule 12(b)(1).

Dated:  January 30, 2024

<u>s/ Ian P. Carleton</u>

Ian P. Carleton, Esq.
Alexandrea L. Nelson, Esq.
Devin T. McKnight, Esq.
Hannah C. Waite, Esq.
SHEEHEY FURLONG & BEHM P.C.
30 Main Street, 6th Floor
P.O. Box 66
Burlington, VT 05402-0066
P: (802) 864-9891

<u>/s/ Lauren R. Goldman</u>

Lauren R. Goldman (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
P: (212) 351-4000
F: (212) 351-4035

Amir C. Tayrani (*pro hac vice*)
Russell B. Balikian (*pro hac vice*)
Zachary Tyree (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
P: (202) 955-8500
F: (202) 467-0539

*Counsel for Monsanto Co., Solutia Inc., and
Pharmacia LLC*