# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF VERMONT

|  |  |
|---|---|
| AMBER NEDDO, as guardian and next friend to Z.N., C.B., and A.B., and all others similarly situated, | |
| *Plaintiff*, | Case No. 2:23-cv-396-GWC |
| *v.* | |
| MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA LLC, | |
| *Defendants*. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
## <u>TO DISMISS CLASS ACTION COMPLAINT</u>

### TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ......................................................................................................................2

I.     **Monsanto has Known that PCBs are Toxic and that They Would Become a Widespread Contaminant for Decades.** ...............................................................2

II.    **Defendants Concealed These Facts from the Public to Protect Their Profits.** ............3

III.   **Monsanto Contaminated Vermont's Public Schools with Toxic PCBs.** .......................5

ARGUMENT ...........................................................................................................................5

I.     **Vermont's Medical Monitoring Statute Applies to Defendants in This Case** ..............5

     A.    **The Statute Covers Defendants' Sale and Distribution of PCBs.** ....................6

          1.    *Monsanto's PCB sales fall within the statutory definition of "release."* ......................................................................................6

          2.    *The circumstances surrounding the statute's enactment and public policy considerations further support applying § 7202 here.* ............................................................9

     B.    **There is No Retroactivity Issue, Because—As Defendants Argue—The Statute Merely Codified An Existing Common Law Right of Plaintiff.** .........11

II.    **Plaintiff States a Claim Under § 7202** .......................................................................13

     A.    **Plaintiff Sufficiently Pleads Tortious Conduct.** ..................................................13

          1.    *Monsanto engaged in tortious conduct.* .....................................................14

          2.    *Defendants' tortious conduct caused Plaintiff's children's exposure to PCBs.* ...................................................................18

     B.    **Plaintiff Sufficiently Alleges Exposure to PCBs "at a Rate Significantly Greater" than the General Population and That Medical Monitoring is Necessary and Reasonable In Cost.** ..........................20

III.   **Plaintiff has Standing to Bring These Claims on Behalf of the Putative Class** .........23

IV.   **In the Alternative, Plaintiff Should be Permitted Leave to Amend Her Complaint** ......................................................................................................25

CONCLUSION .......................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*,
    915 F.2d 1355, (9th Cir. 1990) ..........................................................................8

*Agency of Nat. Res. v. Towns,*
    173 Vt. 552 (2001) ............................................................................................12

*Ahava (USA), Inc. v. J.W.G., Ltd.*,
    250 F. Supp. 2d 366 (S.D.N.Y. 2003) ..............................................................9

*Allison v. Monsanto Co.*,
    No. 18-2-26074-4 (Wash. Super. Ct., Oct. 25, 2022).......................................19

*Austin v. Monsanto Co.*,
    No. 2:23-CV-272, 2024 WL 1607078 (D. Vt. Apr. 12, 2024)...................16, 17

*Ayers v. Twp. of Jackson*,
    106 N.J. 557 (1987) .........................................................................................11

*Babb v. Wilkie*,
    589 U.S. 399 (2020) ..........................................................................................8

*Bard v. Pharmacia LLC*,
    No. 21-2-14305-5 2023 WL 11789683 (Wash. Super. Ct. Dec. 18, 2023).......19

*Barrows v. Becerra*,
    24 F.4th 116 (2d Cir. 2022) ............................................................................ 24

*Buxton v. Springfield Lodge No. 679, Loyal Ord. of Moose, Inc.*,
    2014 VT 52, 196 Vt. 486..................................................................................14

*Caronia v. Philip Morris USA, Inc.*,
    715 F.3d 417 (2d Cir. 2013) ............................................................................22

*Carpenter v. Vermont Dep't of Motor Vehicles*,
    143 Vt. 329 (1983) ..........................................................................................12

*City of San Jose v. Monsanto Co.*,
    231 F. Supp. 3d 357 (N.D. Cal. 2017)..............................................................20

*City of Spokane v. Monsanto Co.*,
    No. 2:15-CV-00201-SMJ, 2016 WL 6275164 (E.D. Wash. Oct. 26, 2016) ..............16, 20

*Clinger v. Pharmacia, LLC*,
    No. 18-2-54572-2SEA, 2023 WL 5762353 (Wash. Super. Ct. May 8, 2023) .................19

*Cnty. of L.A. v. Monsanto Co.*,
    No. CV 19-4694-GW-AFMx, 2019 WL 13064885
    (C.D. Cal. Nov. 21, 2019) ........................................................................................16, 20

*Digital Realty Tr., Inc. v. Somers*,
    583 U.S. 149 (2018) ........................................................................................................6

*Fat Brands Inc. v. Ramjeet*,
    75 F.4th 118 (2d Cir. 2023) ..........................................................................................14

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
    862 F. Supp. 2d 322 (S.D.N.Y. 2012) ..........................................................................25

*Gold v. Eva Nats., Inc.*,
    586 F. Supp. 3d 158 (E.D.N.Y. 2022) ..........................................................................24

*Gratz v. Bollinger*,
    539 U.S. 244 (2003) .................................................................................................23, 24

*Green v. Sherburne Corp.*,
    137 Vt. 310 (1979) ........................................................................................................15

*Grossman v. Simply Nourish Pet Food Co. LLC*,
    516 F. Supp. 3d 261 (E.D.N.Y. 2021) ..........................................................................24

*Grullon v. City of New Haven*,
    720 F.3d 133 (2d Cir. 2013) ..........................................................................................25

*Henson v. Santander Consumer USA Inc.*,
    582 U.S. 79 (2017) ........................................................................................................18

*Johnson v. City of Shelby, Miss.*,
    574 U.S. 10 (2014) ........................................................................................................13

*Kellogg v. Wyeth*,
    762 F. Supp. 2d 694 (D. Vt. 2013) ...............................................................................15

*Kittay v. Kornstein.*
    230 F.3d 531 (2d Cir. 2000) ..........................................................................................21

*Koch v. Christie's Intern. PLC*,
    699 F.3d 141 (2d Cir. 2012) ..........................................................................................21

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
  897 F.3d 88 (2d Cir. 2018) ........................................................................23, 25

*Lee v. Wheeler*,
  130 Vt. 624 (1972) ....................................................................................16, 19

*Long v. Pharmacia LLC*,
  No. 18-2-00001-7 SEA, 2021 WL 6104942 (Wash. Super. Ct. Nov. 19, 2021)..............19

*McLaughlin v. Trelleborgs Angfartygs A/B*,
  408 F.2d 1334 (2d Cir. 1969) ............................................................................14

*Microban Prod. Co. v. API Indus.*, Inc.,
  No. 14 Civ. 41 KPF, 2014 WL 1856471 (S.D.N.Y. May 8, 2014) ....................................9

*O'Brien v. Island Corp.*,
  157 Vt. 135 (1991) ...........................................................................................14

*Oneida Indian Nation of N.Y. v. Cnty. of Oneida*,
  617 F.3d 114 (2d Cir. 2010) ..............................................................................13

*Port of Portland v. Monsanto Co.*,
  No. 3:17-CV-15-PK, 2017 WL 9098079 (D. Or. Apr. 18, 2017) ....................................20

*Retirement Board of the Policemen's Annuity & Benefit
  Fund v. Bank of N.Y. Mellon*,
  775 F.3d 154 (2d Cir. 2014) ..........................................................................24, 25

*Rubman v. Bayer AG*,
  No. 2:22-CV-181, 2023 WL 2632832 (D. Vt. Mar. 24, 2023) ...................................16, 17

*Shires Hous., Inc. v. Brown*,
  2017 VT 60, 205 Vt. 186 .....................................................................................9

*Sosna v. Iowa*,
  419 U.S. 393 (1975) ..........................................................................................23

*Stanley v. Direct Energy Servs. LLC*,
  466 F. Supp. 3d 415 (S.D.N.Y. 2020) ...................................................................23

*State v. Baker*,
  2017 VT 91, 205 Vt. 569 .....................................................................................19

*State v. Monsanto Co.*,
  No. 23-CV-2606, 2024 WL 2818695 (Vt. Super. Ct. May 29, 2024)..............................16

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,

431 F. Supp. 3d 448 (D. Vt. 2019) ............................................................5, 11, 12, 13, 22

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
No. 5:16-CV-125, 2019 WL 8272995 (D. Vt. Aug. 23, 2019) ........................................ 25

*Tambe v. Bowen*,
839 F.2d 108 (2d Cir. 1988) ...................................................................................... 6

*United States v. Calk*,
87 F.4th 164 (2d Cir. 2023) ....................................................................................... 8

*United States v. Kozeny*,
541 F.3d 166 (2d Cir. 2008) ..................................................................................... 18

*United States v. Union Corp.*,
277 F. Supp. 2d 478 (E.D. Pa. 2003).......................................................................... 8

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ................................................................................................ 23

*Walker v. Monsanto Co.*,
No. 1122-CC09621-01, 2016 WL 3193683 (Mo. Cir. May 26, 2016) ............................ 19

**Statutes**

Vt. Stat. Ann. tit. 12, § 7202 ...........................................................................*passim*

Vt. Stat. Ann. tit. 12, § 7201 ........................................................................ 1-2, 7, 9, 10

Vt. Stat. Ann. tit. 1, § 214 ......................................................................................12

Vt. Stat. Ann. tit. 10, § 6615(a)(5).............................................................................9

**Rules**

Fed. R. Civ. P. Rule 12 .............................................................................................2

Fed. R. Civ. P. Rule 23 ........................................................................................23, 25

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .......................................................................7

Restatement (Second) of Torts § 281 ........................................................................ 16

Restatement (Second) of Torts § 552 ........................................................................ 17

Jim Therrien, *$34M Settlement Agreement Reached in Bennington PFOA Suit*, Bennington Banner (Nov. 11, 2021), https://bit.ly/3GPYhYP ........................................................ 10

## INTRODUCTION

This case will be the first to interpret the Vermont medical monitoring statute enacted in 2022 to provide relief to those who are at an increased risk of serious disease due to exposure to a toxic substance. Vt. Stat. Ann. tit. 12, § 7202 ("§ 7202"). The purpose of the statute is to make the entity whose tortious conduct caused the exposure—not the person harmed—bear the cost of medical monitoring. Following traditional principles of statutory interpretation, informed by the legislative history, the statute applies here: the original Monsanto Company ("Monsanto")[1] tortiously manufactured, marketed, and sold a group of highly toxic chemicals called polychlorinated biphenyls ("PCBs") for use in building materials while concealing the extent of PCBs' toxicity and that the chemical would inevitably contaminate the buildings containing those materials.[2] Plaintiff's children attended one of the twenty-six Vermont schools contaminated by Monsanto's PCBs, and this PCB exposure has placed them at an increased risk of serious disease. They now seek the cost of medical monitoring from Defendants pursuant to § 7202, which was enacted for precisely this situation.

Defendants motion to dismiss arguments fall into three buckets: First, they argue that § 7202 does not apply. Defendants rewrite the statute to support their view that liability is limited to polluters who emit toxic substances into the environment immediately surrounding a Vermont-based facility. That interpretation isn't supported by the plain meaning of the statute's definitions. Among other thing, "[r]elease"—the critical, at-issue term—is defined as "*any* act or omission that allows a proven toxic substance to enter the air, land, surface water, or groundwater." Vt.

---

[1]	"Monsanto" refers to the entity that operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business prior to splitting into the current Monsanto Company, Pharmacia LLC, and Solutia Inc. (Compl., Dkt. 1 ¶¶ 9-13.)

[2]	Defendants pepper their brief with the idea that this manufacture was "lawful," but it's not clear in what sense they mean that—juries have awarded nearly $2 billion in damages to people poisoned by PCBs in schools so far.

Stat. Ann. tit. 12, § 7201(11) (emphasis added). Monsanto's acts allowed a proven toxic substance to enter the air. Nor do the public policy concerns at which the statute is aimed counsel in favor of Defendants' desire to advance the most limited possible reading of this statute.

Defendants' other argument in this bucket—that § 7202 cannot apply retroactively—fails because this is not a retroactive application of the statute in the first place. Second, Defendants argue that Plaintiff has not sufficiently alleged the elements of a § 7202 claim for medical monitoring. These arguments do not pass muster because they, again, misread the statute, ignore the allegations in the Complaint, and attempt to impermissibly introduce evidence outside of the Complaint and to hold Plaintiff to a heightened pleading standard. Third, Defendants move to dismiss under Rule 12(b)(1) for lack of class standing, but they conflate jurisdictional issues with those that should be addressed at class certification.[3] The motion to dismiss should be denied.

## BACKGROUND

### I.     Monsanto has Known that PCBs are Toxic and that They Would Become a Widespread Contaminant for Decades.

Monsanto was the sole commercial manufacturer of PCBs—which they primarily sold under the trade name "Aroclor"—from the 1930s to approximately 1979. (Dkt. 1 ¶¶ 28-29.) The company knew that PCBs were toxic as early as 1936, when three of its factory workers exposed to PCBs died due to severe liver damage and others developed serious health problems. (*Id.* ¶ 36.) Monsanto's knowledge of PCB's toxicity grew rapidly. An internal document from February 1952 admitted that the "toxicity hazard of Aroclor's fumes is well established," and recounted that a "few deaths, and relatively large number of acne or dermatitis cases" had arisen

---

[3]     Defendants also moved to dismiss based on lack of personal jurisdiction under Rule 12(b)(2), (dkt. 27 at 9-10); however, they have subsequently consented to personal jurisdiction in this case and have waived any right to contest personal jurisdiction in the future in this matter. (*See* Dkt. 36.)

in connection with exposure to the chemical during the war. (*Id*. ¶ 40.) In 1955, Monsanto's Chief Chemist authored an internal report referencing a 1947 article entitled "On the Toxicity of the 'Aroclors'" that stated, "[t]here is need therefore to give warning about PCBs. For the toxicity of these compounds has been repeatedly demonstrated." (*Id*. ¶ 41.) That same year, Monsanto's Medical Director, Dr. Emmet Kelly, admitted in an internal memo that Monsanto knew that PCBs were toxic. (*Id*. ¶ 42.) Later that year, Monsanto's Medical Department advised workers not to eat their lunches in the Aroclor department due to its toxicity. (*Id*. ¶ 43.) And in 1957, Dr. Kelly reported that the U.S. Navy refused to use Monsanto's PCBs because research demonstrated that inhalation caused severe liver damage. (*Id*. ¶ 44.)

In addition to its knowledge that PCBs were toxic, Monsanto was also aware that its PCBs would inevitably escape from their intended applications into the surrounding environment. (*Id*. ¶ 45.) Two published articles in 1966 and 1968 found that PCBs were spreading in high volumes due to their use in manufacturing. (*Id*. ¶¶ 47-48.) In 1969, The manager of Monsanto's Research and Development of Research Organics Division, W. R. Richard admitted that research showed that PCBs are easily and broadly distributed in air and water and that they are "an uncontrollable pollutant and endangering man himself." (*Id*. ¶ 50.) That same year, Richard wrote a memo admitting that PCBs will leak from virtually all applications, including such "closed" applications as air compressors, heat transfer, and capacitor fluids. (*Id*. ¶ 53.) This was affirmed in a 1969 report by the company's Aroclor Ad Hoc Committee, which admitted that "there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination." (*Id*. ¶ 58.)

## II.   Defendants Concealed These Facts from the Public to Protect Their Profits.

Rather than respond to this information in a reasonable manner, Monsanto's primary concern appeared to be not with the dangers of widespread PCB contamination, but with the

public reaction to it. (Dkt. 1 ¶ 49.) Consequently, Monsanto tried to protect its profits by developing a concerted strategy to conceal the extent of PCBs' toxicity and the fact that they would inevitably leak from their intended applications into the surrounding environment. In 1969, for example, Richard wrote a memorandum titled "Defense of Aroclor," which laid out a strategy to protect Monsanto's profitable PCB franchise. (*Id*. ¶ 51.) This was built out by the company's Aroclor Ad Hoc Committee, which was tasked with protecting the continued sales and profits of PCBs even though it explicitly acknowledged that PCBs would consequently become a "global contaminant." (*Id*. ¶¶ 54-58.) In a 1969 company presentation, the Committee ultimately concluded that "[t]here is too much customer/market need and selfishly too much Monsanto profit to go out of the PCB business entirely." (*Id*. ¶ 59.)

Part of Monsanto's strategy was to make deliberate misrepresentations to the public. For example, in a 1969 letter to the L.A. County Air Pollution Control District, Monsanto advised that PCBs "are not particularly toxic by oral ingestion or skin absorption." (*Id*. ¶ 61.) Similarly, a Monsanto letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems." (*Id*.) Monsanto made similar misrepresentations to the New Jersey Department of Conservation in July 1969. Monsanto also misrepresented its knowledge that PCBs would inevitably leak from their intended applications. In the letter to L.A. County, Monsanto claimed ignorance as to the origin of PCBs found along the West Coast, explaining that "very little Aroclor would normally be expected either in the air or in the liquid discharges from a using industry." (*Id*. ¶ 62.) And in 1970, Monsanto issued a statement in the Journal *Environment* claiming that (a) PCBs cannot escape so-called "closed applications" where PCBs are "completely sealed in metal containers"; (b) PCBs cannot escape applications such as adhesives, elastomers, and surface coatings; and (c) it is simply "not true" that PCBs are "highly

toxic." (*Id*. ¶ 64.) Monsanto knew these statements were false.

Monsanto's concealment campaign and Aroclor defense strategy were successful, as its PCB production peaked in 1970, (*id*. ¶ 60), and it continued to ship tons of PCBs per year into Vermont throughout the 1970s, (*see* dkt. 28 at 4).

## III. Monsanto Contaminated Vermont's Public Schools with Toxic PCBs.

As Monsanto knew would happen, PCBs used in building materials and electrical equipment in Vermont schools escaped from those applications into the air and dust that accumulated in the school buildings. (Dkt. 1 ¶ 65.) Government mandated air testing has revealed high levels of the toxic chemical throughout twenty-six Vermont public schools. (*Id*. ¶¶ 67-68.) This includes Cabot School—the school that Plaintiff's three children attended. (*Id*. ¶ 85.) Cabot School has been contaminated with PCBs at a concentration of 210 ng/m3, which corresponds with a cancer risk greater than one in 100,000 for adults and significantly more for children that attend the school. (*Id*. ¶ 80.) Defendants introduce facts outside the four corners of the Complaint to argue that not *every part* of the school was contaminated at this level, (dkt. 27 at 7-8), but they implicitly concede that a concentration of 210 ng/m3 exceeds the action levels set by the Vermont Department of Health and the EPA (*see* dkt. 1 ¶¶ 72, 75-80).

## ARGUMENT

## I. Vermont's Medical Monitoring Statute Applies to Defendants in This Case.

In 2022, the Vermont Legislature enacted a medical monitoring statute that provides a remedy to Vermonters exposed to toxic substances caused by a company's tortious conduct. The statute is widely understood to codify parts of this Court's holding in *Sullivan v. Saint-Gobain Performance Plastics Corp*., which recognized a medical monitoring remedy under Vermont law. 431 F. Supp. 3d 448 (D. Vt. 2019). In doing so, this Court followed the line of cases recognizing "the important public health interest in fostering access to medical testing for individuals whose

exposure to toxic chemicals creates an enhanced risk of disease." *Id*. at 464. Plaintiff's children—who are at an increased risk of serious disease from exposure to Monsanto's PCBs—are exactly who the statute is meant to protect.

Defendants argue that § 7202 does not apply here for two reasons: First, they contend that the statute applies only to defendants that emit toxic substances directly into the environment immediately surrounding Vermont-based facilities, not to a defendant who releases PCBs into Vermont through their sale and distribution. Second, Defendants argue that any application of the statute to them would be impermissibly retroactive because they stopped selling PCBs over forty years ago. Both arguments are incorrect.

### A.    The Statute Covers Defendants' Sale and Distribution of PCBs.

Section 7202 provides a cause of action for medical monitoring against "a person who is the owner or operator of a large facility from which a proven toxic substance was released." Vt. Stat. Ann. tit. 12, § 7202(a). As an initial matter, there's not a debate about whether Monsanto was an "owner" of a "large facility." (Dkt. 27 at 13.) Instead, the question is which interpretation of the word "release" is right: Defendants argue that "release" of a toxic substance must be interpreted as meaning "emitted directly" from a facility into the environment, whereas Plaintiffs argue "release" means "release" as it is statutorily defined. (Dkt. 27 at 11-12.) According to Defendants, "release" does not include sales of the PCBs from their Alabama and Illinois facilities that ultimately contaminated the air and dust in Vermont schools. (*Id*.) Defendants' reading of the statute, however, is belied by both the statutory definition of "release" and the circumstances surrounding the statute's enactment.

#### 1.    *Monsanto's PCB sales fall within the statutory definition of "release."*

"When a statute includes an explicit definition, [courts] must follow that definition, even

if it varies from a term's ordinary meaning." *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) (quotations omitted). The statute defines "[r]elease" as "*any* act or omission that *allows* a proven toxic substance to enter the air, land, surface water, or groundwater." Vt. Stat. Ann. tit. 12, § 7201(11) (emphasis added). "'Any' means without restriction or limitation." *Tambe v. Bowen*, 839 F.2d 108, 110 (2d Cir. 1988). And "allow" means "[t]o permit" or "[t]o put no obstacle in the way of; to suffer to exist or occur." Black's Law Dictionary (11th ed. 2019).

Here, Monsanto's sale of PCBs for use in building and electrical products was an act that "allow[ed]"—*i.e.*, permitted—the PCBs "to enter the air, land, surface water, or groundwater" of the Vermont schools as those products degraded. In fact, because there is virtually no way to prevent PCBs from leaking from their intended applications, Monsanto's sale of the PCBs—rather than subsequent misuse or mishandling of the PCBs—not only *allowed* PCBs to enter the air in Vermont schools, it made such entry *inevitable*. What's more, Monsanto had actual knowledge of this fact, (*see* Dkt. 1 ¶ 53), and by proceeding with the sales anyway, it "suffered to exist" the fact that its PCBs would pollute the schools' air and land without "put[ting] [any] obstacle in the way of" this result. Black's Law Dictionary (11th ed. 2019).

While Defendants acknowledge that the statute defines "release" and the Court must, therefore, give effect to that definition, (*see* dkt. 27 at 12), they subsequently ask the Court to rewrite it. Specifically, they replace the phrase "any act or omission that allows" a toxic substance to enter the environment with "the actual process by which" a toxic substance enters the environment. (Dkt. 27 at 12; *see also id*. at 14 (claiming "a 'release' is the actual entrance of the substance into 'the air, land, surface water, or groundwater.'").) Under their new definition, Defendants claim that a toxic substance is "released" from a facility only when it is "emitted directly from that facility into the environment." (Dkt. 27 at 11-12.) This re-write, conveniently,

limits the "act[s]" that can constitute a "release" to only a direct emission.

The statutory definition does not support such a narrow interpretation. The term "any" before "act or omission" indicates that the Legislature took an expansive view of the type of "act" that could constitute a release. *See United States v. Calk*, 87 F.4th 164, 182 (2d Cir. 2023) ("[T]he Supreme Court has 'repeatedly explained that the word "any" has an expansive meaning[.]'" (quoting *Babb v. Wilkie*, 589 U.S. 399, 405 n.2 (2020))). Accordingly, the sale of a toxic substance that "allows" the substance to enter the environment falls squarely within this definition. And critically, nowhere does the statute require that the toxic substance be "directly" released from the facility, as the modifier "directly" does not appear a single time in the statute—though it appears over ten times in Defendants' brief.[4]

Next, Defendants turn to inapposite hazardous waste disposal cases that interpret the statutory term "disposal" of hazardous waste to exclude the "sale" of "a useful product." (Dkt. 27 at 15 (citing *United States v. Union Corp.*, 277 F. Supp. 2d 478, 491 (E.D. Pa. 2003)).) These courts reasoned that the term disposal "refer[s] only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance." *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1362 (9th Cir. 1990). Defendants claim that this "reasoning applies with equal force to the 'release' of a substance," (dkt. 27 at 15), but it is not clear how that could be true given that the terms "disposal" and "release" have very different ordinary (and statutorily defined) meanings. In any event, the ordinary meaning of "release" often does mean "sale" in the context of "releasing" items into the stream of commerce. *See, e.g.*,

---

[4]    Defendants also make much of the term "from," arguing that the PCBs must be released "from" the "large facility" and not "from" a finished product that was manufactured by a third party. (Dkt. 27 at 14.) This point is irrelevant because Plaintiff argues that the "release" occurred at the point of sale and distribution from Defendants' Alabama and Illinois facilities—not when the PCBs ultimately leaked from the finished applications.

*Ahava (USA), Inc. v. J.W.G., Ltd.*, 250 F. Supp. 2d 366, 367 (S.D.N.Y. 2003) (describing products as "released into the stream of commerce through their sale" at retail stores); *Microban Prod. Co. v. API Indus.*, Inc., No. 14 Civ. 41 KPF, 2014 WL 1856471, at *11 (S.D.N.Y. May 8, 2014). But the Court must give effect to the statutorily defined meaning of release and, therefore Defendants' arguments—even if more fully fleshed out—are unpersuasive.

Finally, to the extent Defendants argue that the connection between Monsanto's manufacturing facilities and the presence of PCBs in Vermont schools is too attenuated, (*see* dkt. 27 at 14-15), this is a question of proximate causation, not statutory interpretation, and is addressed *infra* Section II.A.2.[5]

## 2.   *The circumstances surrounding the statute's enactment and public policy considerations further support applying § 7202 here.*

Though the Court need not proceed further because the plain, ordinary meaning of the statute is clear on its face, *Shires Hous., Inc. v. Brown*, 2017 VT 60 ¶ 9, 205 Vt. 186, 191-92, the context in which § 7202 was passed and the public policy considerations that informed the statute provide additional support for Plaintiff's position. Though underdeveloped, Defendants' argument seems to be that the Vermont Legislature modeled the statute after this Court's test in *Saint-Gobain* and, therefore, the statute can *only* apply to companies like the one in that case— that is, the owner of a Vermont-based facility that emits toxic substances directly into the surrounding environment. Defendants do not explain why legislation following a case means that

---

[5]      In a footnote, Defendants point to Vermont's Waste Management Act, which permits the State to sue "any person who manufactured for commercial sale a hazardous material." (Dkt. 27 at 15 n.8 (quoting Vt. Stat. Ann. tit. 10, § 6615(a)(5)).) Defendants interpret the absence of this language in § 7202 as meaning that the statute does not apply to those who manufacture and sell PCBs. This is not a textually supportable position, as § 7202 permits suit against "the owner or operator of a large facility," and "[f]acility" is defined as "land, structures, [and] other appurtenances . . .  where proven toxic substances are *manufactured*, processed, used, or stored." Vt. Stat. Ann. tit. 12, § 7201(4) (emphasis added). Monsanto fits those statutory definitions, whether or not it's *also* a manufacturer that might be liable to the state.

legislation is limited to the facts of that case. Nothing in the circumstances surrounding enactment supports Defendants' view and, in fact, the public policy at which the statute is aimed points in the opposite direction.

Defendants' key piece of legislative evidence is a document submitted into the legislative record by the Vermont Office of Legislative Counsel that compares the medical monitoring test laid out in *Saint-Gobain* with that in § 7202. (Dkt. 27 at 6 (citing *Comparison of Medical Monitoring Elements*, VT LEG #359633 v. 1 (Jan. 19, 2022), https://bit.ly/4arIjSt).) The comparison notes that the *Saint-Gobain* test applies to any defendant who exposed the plaintiff to the hazardous substance, whereas § 7202 applies only to "the owner or operator of a large facility from which the toxic substance was released." *Id*. But Defendants don't contest that Monsanto owned or operated large "[f]acilities"—*i.e.* "contiguous land, structures, other appurtenances . . . where proven toxic substances are manufactured, processed, used, or stored." Vt. Stat. Ann. tit. 12, § 7201(4). And, as explained above, Monsanto released PCBs from these facilities through sales and distribution. In other words, Monsanto was not the type of corporation this provision was meant to carve out from liability.[6]

Furthermore, the public policy considerations outlined by this Court in *Saint-Gobain*, which informed the Legislature in passing § 7202, support applying the statute to Defendants in this case. First, holding defendants liable for exposing Vermonters to toxic chemicals is "consistent with the important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease." *Saint-*

---

[6]     Similarly, the public statements by State Senators that Defendants cite in a footnote say nothing about the location of the defendant polluter, instead emphasizing that the purpose of the bill was "to make medical monitoring a liability of the polluter, not the taxpayer or citizen who has been harmed." Jim Therrien, *$34M Settlement Agreement Reached in Bennington PFOA Suit*, Bennington Banner (Nov. 11, 2021), https://bit.ly/3GPYhYP (last visited July 2, 2024) (Senator Sears comments); *see* (Dkt. 27 at 6 n.4).

*Gobain*, 431 F. Supp. 3d at 464 (quoting *Ayers v. Twp. of Jackson*, 106 N.J. 557, 603 (1987)). The value of medical monitoring is in the potential to save lives through early detection and treatment of diseases caused by the toxic exposure. *Id*. This important public interest applies with equal force to protect Vermonters from out-of-state defendants responsible for their exposure as it does to in-state defendants.

Second, the public policy interest in deterring polluters also supports Plaintiff's view. *See id*. at 464. We already know that Monsanto chose its bottom line over the health and lives of the public when it decided to continue producing and selling PCBs despite knowing the inevitable health consequences. (Dkt. 1 ¶¶ 36-64.) The only way to change corporate behavior is to make the profitable, tortious conduct more costly. And holding out-of-state companies like Monsanto accountable under § 7202 when their tortious conduct causes foreseeable harm in Vermont is consistent with the Legislature's intent to shift the cost from the person harmed to the polluter.

Finally, the countervailing concern regarding "unforeseen economic consequences to the defendant" does not apply here. *See Saint-Gobain*, 431 F. Supp. 3d at 466. The harm Plaintiff complains of was *actually* foreseen by Monsanto. But Defendants make much of this argument, claiming Plaintiff's interpretation would turn § 7202 into "a boundless product-liability statute." (Dkt. 27 at 1.) This is a red herring. The statute defines "release" broadly, but liability will necessarily be limited by the fact that a plaintiff must overcome six other hurdles—proving each by a preponderance of the evidence—to recover under § 7202. Vt. Stat. Ann. tit. 12, § 7202(a).

## B.   There is No Retroactivity Issue, Because—As Defendants Argue—The Statute Merely Codified An Existing Common Law Right of Plaintiff.

Next, Defendants argue that they cannot be held liable because § 7202 cannot be applied retroactively. (Dkt. 27 at 17.) Specifically, Defendants assert that any application of § 7202 to them "would necessarily be retroactive as a matter of law" because Monsanto stopped producing

PCBs over forty years ago. (*Id.*) But this is not how retroactivity works. "[A] statute is not retrospective [when] it merely relates to prior facts or transactions but does not change their legal effect[.]" *Carpenter v. Vermont Dep't of Motor Vehicles*, 143 Vt. 329, 333 (1983). Rather, the application of an amended or newly enacted statute is only considered retroactive if it "affect[s] any right, privilege, obligation, or liability acquired, accrued, or incurred prior to the effective date of the amendment or repeal." Vt. Stat. Ann. tit. 1, § 214(b)(2).

Section 7202 did not affect any right of Defendants, nor did it impose a new liability because the conduct at issue here—the tortious release of a toxic substance—would have been actionable even absent the statute's enactment. As is discussed above, this Court recognized a common-law right to sue for medical monitoring in Vermont before the enactment of § 7202. *See Saint-Gobain*, 431 F. Supp. 3d at 466 (recognizing common-law medical monitoring remedy). Accordingly, if the Legislature had not passed § 7202, Plaintiff could still have brought a tort action seeking medical monitoring for her children because they are currently at an increased risk of serious disease as a result of Monsanto's tortious conduct. *Id*. It was this common-law right that the statute replaces: § 7202 now provides "the *exclusive* remedy for a person without a present injury to bring a cause of action to seek medical monitoring due to exposure to a proven toxic substance." Vt. Stat. Ann. tit. 12, § 7202(d)(1) (emphasis added). Under Defendants' theory of retroactivity, while Plaintiff had a right to sue them for medical monitoring before the enactment of § 7202, that right was extinguished when the Vermont Legislature decided to codify it in a statute. This is not what the bar on retroactive application of statutes requires.

*Agency of Nat. Res. v. Towns*, 173 Vt. 552 (2001) is instructive. There, the Court found that an amended version of a statute that prohibited the operation of a solid waste management facility without a certificate was not retroactive in its application because the amendment

changed only the enforcement regime and not the substantive violation. *Id*. at 556. The court explained that the defendant "never had a vested right to operate the facility without certification," nor did it have a "preexisting right in a [different] enforcement scheme." *Id*. at 556-57. Here, similarly, Monsanto never had a right to tortiously release toxic chemicals, nor did it have a right to be free from medical monitoring suits arising out of that tortious conduct (whatever the enforcement scheme). Simply put, application of § 7202 here is not retroactive.

## II.    Plaintiff States a Claim Under § 7202.

### A.    Plaintiff Sufficiently Pleads Tortious Conduct.

Section 7202 requires that a plaintiff prove, among other things, that she was exposed to a toxic substance "as a result of tortious conduct of the defendant." Vt. Stat. Ann. tit. 12, § 7202(a)(3). Defendants argue that Plaintiff fails to allege tortious conduct and causation, but their argument misunderstands the statute and federal pleading standards. As an initial matter, Plaintiff does not have to "name[] a specific tort," as Defendants contend, (dkt. 27 at 20), because a plaintiff need only plead facts, not theories of liability. *Johnson v. City of Shelby, Miss*., 574 U.S. 10, 11 (2014) (noting that federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."); *Oneida Indian Nation of N.Y. v. Cnty. of Oneida*, 617 F.3d 114, 139 (2d Cir. 2010) ("the essence of a cause of action is found in the facts alleged and proven by the plaintiff, not the particular legal theories articulated."). Nor does Plaintiff have to allege that *all* elements of that tort are satisfied. (*See* Dkt. 27 at 19.) For example, a present physical injury is typically a required element of the enumerated torts. *See Saint-Gobain*, 431 F. Supp. 3d at 452 (discussing physical injury rule in Vermont). But § 7202 explicitly gives a cause of action to a person "without a present injury." Vt. Stat. Ann. tit. 12, § 7202(a). It would be nonsensical to read the statute to require a plaintiff to plead an element that it explicitly exempts.

Instead, what § 7202 requires with respect to conduct and causation are simply allegations that (1) Defendants engaged in "tortious *conduct*" and (2) that conduct "result[ed]" in Plaintiff's children's exposure to PCBs. *Id*. (emphasis added). In practice this means that the causation and harm elements typically required by common law torts are supplanted by the statute. Negligence, for example, is the "breach of a duty of care." *O'Brien v. Island Corp.*, 157 Vt. 135, 146 (1991) (Dooley, J. concurring); *McLaughlin v. Trelleborgs Angfartygs A/B*, 408 F.2d 1334, 1337 (2d Cir. 1969) ("negligence is a breach of a duty to others"). While liability for the common law tort typically requires that the negligent conduct cause physical harm, the medical monitoring statute only requires that the negligent conduct cause the plaintiff's exposure.

The cases on which Defendants rely are inapposite because the claims at issue there explicitly require, rather than exempt, the elements of the underlying tort. *Buxton v. Springfield Lodge No. 679, Loyal Ord. of Moose, Inc.*, 2014 VT 52 ¶13, 196 Vt. 486, 493 (respondeat superior liability for the principal "requires the agent to commit some wrongful act"); *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 128 (2d Cir. 2023) ("To state a claim for conspiracy to commit fraud, a plaintiff must allege both a primary fraud tort as well as the four elements of conspiracy.").

### 1. *Monsanto engaged in tortious conduct.*

Defendants' claim that they "lack notice of what they allegedly did wrong" is belied by the facts of the Complaint. (*See* dkt. 27 at 20.) Plaintiff lays out Monsanto's tortious conduct in painstaking detail in over thirty-five paragraphs of her Complaint. (Dkt. 1 ¶¶ 28-64.) Specifically, Monsanto acted tortiously (1) by manufacturing, marketing, and selling "a product it knew or should have known to be dangerous," and (2) by concealing and "misrepresenting material facts about PCBs to the public, including its toxicity and its ability to escape its intended

applications."(*See id*. ¶¶ 93, 100.) This constitutes negligence (or, as relevant under the statute, breach of a duty of care).

"Whether there is a legal duty is primarily a question of law, dependent upon a variety of relevant factors of which foreseeability of the risk is a primary consideration." *Kellogg v. Wyeth*, 762 F. Supp. 2d 694, 705 (D. Vt. 2013) (cleaned up); *Green v. Sherburne Corp*., 137 Vt. 310, 312 (1979) ("It has been the law of Vermont for many years that the . . . duty of care in any given situation was measured in terms of the avoidance of reasonably foreseeable risks to the person to whom such duty is owed."). "The duty of care increases commensurably with the enlargement of the risk foreseeably involved in the operation undertaken." *Green*, 137 Vt. at 312. Here, Monsanto was under two related duties.

First, Monsanto had a duty not to manufacture, market, sell, and distribute its PCBs for use in building and lighting materials like those that ended up in the Vermont schools. Monsanto *actually foresaw* that PCB contamination of the kind that underlies Plaintiff's claims would be an inevitable consequence of its manufacture, sale, and distribution of PCBs. Specifically, Monsanto knew of PCBs' toxicity as early as the 1930s, (dkt. 1 ¶¶ 36-38), and it admitted on multiple occasions throughout the 1950s that it knew PCBs were toxic and caused serious disease in humans, (*id*. ¶ 40-43). Furthermore, Monsanto knew that there was no way to prevent PCBs from leaking from finished products into the surrounding environment. For example, in 1969, the manager of Monsanto's Research and Development of Research Organics Division acknowledged that PCBs are "toxic substance[s]" that are easily and broadly distributed in air and water, and that they are "an uncontrollable pollutant and endangering man himself." (*Id*. ¶ 50.) He admitted that PCBs will inevitably leak from virtually all applications, including such "closed" applications as air compressors, heat transfer, and capacitor fluids. (*Id*. ¶ 53.)

With this context, it is perhaps not surprising that a Vermont state court recently determined that Monsanto "owed a legal duty to the State of Vermont *and its citizens*" for a negligence claim based, in part, on the same facts alleged here regarding PCB contamination of Vermont schools. *State v. Monsanto Co.*, No. 23-CV-2606, 2024 WL 2818695, at *7 (Vt. Super. Ct. May 29, 2024) (emphasis added). This is consistent with decisions from courts across the Country, which have found that Monsanto owed a duty of care to plaintiffs harmed by its PCB contamination. *See, e.g.*, *Cnty. of L.A. v. Monsanto Co.*, No. CV 19-4694-GW-AFMx, 2019 WL 13064885, at *15 (C.D. Cal. Nov. 21, 2019) (finding duty owed to city in waterway contamination case), *City of Spokane v. Monsanto* Co., No. 2:15-CV-00201-SMJ, 2016 WL 6275164, at *9 (E.D. Wash. Oct. 26, 2016) (same).

While breach is typically a question of fact for the jury, *Lee v. Wheeler,* 130 Vt. 624, 627 (1972), Plaintiff has sufficiently pleaded this element. Despite knowing that PCBs were toxic and that they would inevitably leak from their applications into the surrounding environment, Defendants continued to manufacture, market, sell, and distribute the chemical for decades. (Dkt. 1 ¶ 60.) No reasonable company would have continued to produce and sell PCBs with this knowledge without taking steps to mitigate the harm, but Monsanto's PCB production peaked in 1970—forty years after it discovered that PCBs were toxic. *See* Restatement (Second) of Torts § 281, cmt. e ("Conduct is negligent because it tends to subject the interests of another to an unreasonable risk of harm."); (Dkt. 1 ¶ 60).

Second, Defendants also had a duty to not conceal and misrepresent PCBs' toxicity. Two courts in this district have recently found that the Defendants in *this* case breached a duty of disclosure to teachers and former students at a Vermont school on virtually identical facts. *Rubman v. Bayer AG*, No. 2:22-CV-181, 2023 WL 2632832, at *4 (D. Vt. Mar. 24, 2023); *Austin*

*v. Monsanto Co*., No. 2:23-CV-272, 2024 WL 1607078, at *3-4 (D. Vt. Apr. 12, 2024). The plaintiffs in those cases are teachers and former students at Burlington High School—one of the schools at issue in this case—who were exposed to PCBs from electrical equipment and building materials at the school. *Rubman*, 2023 WL 2632832, at *1; *Austin*, 2024 WL 1607078, at *1-2.

With respect to duty in a negligent misrepresentation claim, "[t]he liability of one who is under a *public duty* to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them." Restatement (Second) of Torts § 552(3) (emphasis added). The *Rubman* and *Austin* courts found that the materials used in the construction of the school were plausibly intended to benefit the school's students, faculty, and administrators. *Rubman*, 2023 WL 2632832, at *4; *Austin*, 2024 WL 1607078, at *3-5. Accordingly, they determined, as a matter of law, that Monsanto owed a public duty of disclosure that extended to "the students, faculty and administrators who would spend their days in the [Vermont school]." *Rubman*, 2023 WL 2632832, at *4; *Austin*, 2024 WL 1607078, at *3. Under the same logic, this public duty extends to Plaintiff's children because the materials used in the construction of Cabot School—which contained Monsanto's PCBs—were intended to benefit Plaintiff's children as students who attended that school.

Defendants breached this duty by concealing and misrepresenting material facts to the public—including the Cabot School—in order to protect their PCB profits. For example, Monsanto sent letters to Los Angeles and New Jersey officials and a Regional Water Quality Control Board claiming that PCBs were not toxic and are associated with "no special health problems." (Dkt. 1 ¶¶ 61-63.) Monsanto also misrepresented the fact that PCBs would inevitably leak from their intended applications to become a widespread contaminant. (*See id*. ¶ 62.) And in 1970—at the peak of PCB production and Monsanto's knowledge of PCB toxicity—Monsanto

issued a statement in the Journal *Environment* claiming that it is simply "not true" that PCBs are "highly toxic", and that PCBs cannot escape so-called "closed applications." (*Id*. ¶ 64.)

### 2. *Defendants' tortious conduct caused Plaintiff's children's exposure to PCBs.*

With respect to causation, Defendants argue Plaintiff must satisfy the causation element of the relevant tort—in this case, negligence. (Dkt. 27 at 20.) This is wrong for the reasons explained above and because that interpretation would render superfluous § 7202's own causation requirements. *See United States v. Kozeny*, 541 F.3d 166 (2d Cir. 2008) ("When interpreting a statute, we are required to give effect, if possible, to every clause and word of a statute and to avoid statutory interpretations that render provisions superfluous[.]" (cleaned up)). Section 7202 contains two causation elements with different standards. First, a plaintiff must prove that she was exposed to a toxic substance "as a result of tortious conduct of the defendant." Vt. Stat. Ann. tit. 12, § 7202(a)(3). And second, she must prove that "as a *proximate result* of the exposure, [she has] suffered an increased risk of contracting a serious disease." *Id*. § 7202(a)(4) (emphasis added). Only the first causation element is at issue here, but the second element, which explicitly uses the phrase "proximate result," makes clear that the former contemplates only a but-for causation requirement, not a proximate causation requirement. *See Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) ("differences in language . . . convey differences in meaning").

Defendants do not seem to contest that Monsanto's conduct is the but-for cause of Plaintiff's children's exposure to PCBs. (Dkt. 27 at 20.) Indeed, they could not, as Monsanto was the *only* commercial manufacturer and distributor of PCBs in the United States. (Dkt. 1 ¶ 29.) Plaintiff's children, therefore, would not have been exposed to PCBs had Monsanto not negligently manufactured, sold, and distributed them.

Even if the Court interprets the statute to require proximate causation here, that would be a question for the jury. *Lee,* 130 Vt. at 627. The hallmark of proximate causation is foreseeability. *State v. Baker*, 2017 VT 91, ¶10, 205 Vt. 569, 575. Defendants argue that Plaintiff has not established that Monsanto could have foreseen that its PCBs would place Plaintiff's children and the putative class at risk of serious disease. (Dkt. 27 at 20.) This ignores the decades-long history that Plaintiff recounts establishing that Monsanto knew that PCB exposure caused serious disease (dkt. 1 ¶¶ 36-44), that PCBs could not be contained within their intended applications (*id*. ¶¶ 49-53), that PCBs were not subject to significant degradation over time following their inevitable escape into the environment (*id*. ¶ 52), and that PCBs would consequently be expected to spread and become a "global contaminant" (*id*. ¶¶ 46-58). Monsanto, nevertheless, continued to explicitly market and sell PCBs for use in building materials like those in the at-issue Vermont schools. (*Id*. ¶¶ 18, 31, 65, 100.) Furthermore, Monsanto shipped tons of PCBs per year into Vermont during the 1970s, when knowledge about the extent of PCBs' toxicity and environmental contamination was at its peak. (*See* dkt. 28 at 4.) Accordingly, Defendants cannot reasonably contend that that PCB contamination of Vermont schools was unforeseeable.

This is in line with the numerous jury verdicts finding that Monsanto's negligence caused harm on similar facts. *See Bard v. Pharmacia LLC*, No. 21-2-14305-5 2023 WL 11789683 (Wash. Super. Ct. Dec. 18, 2023); *Clinger v. Pharmacia, LLC*, No. 18-2-54572-2SEA, 2023 WL 5762353 (Wash. Super. Ct. May 8, 2023); *Allison v. Monsanto Co.*, No. 18-2-26074-4 (Wash. Super. Ct., Oct. 25, 2022); *Long v. Pharmacia LLC*, No. 18-2-00001-7 SEA, 2021 WL 6104942 (Wash. Super. Ct. Nov. 19, 2021); *Walker v. Monsanto Co*., No. 1122-CC09621-01, 2016 WL 3193683 (Mo. Cir. Ct. May 26, 2016).

Defendants baldly assert that proximate causation cannot be adequately pleaded unless Plaintiff alleges when the PCBs and PCB-containing products in the Vermont schools were manufactured, who manufactured the PCB-containing products, and when those products were installed. (Dkt. 27 at 20-21.) Defendants provide no authority for these fabricated requirements. Indeed, courts across the country have explicitly rejected this argument, finding proximate causation properly pleaded against these same Defendants on similar PCB-related contamination claims without considering this type of information.[7] *See Cnty. of L.A.*, 2019 WL 13064885, at *13-15; *Port of Portland v. Monsanto Co.*, No. 3:17-CV-15-PK, 2017 WL 9098079, at *19 (D. Or. Apr. 18, 2017), *report and recommendation adopted in relevant part*, No. 3:17-CV-00015-PK, 2017 WL 4236561 (D. Or. Sept. 22, 2017); *City of San Jose v. Monsanto Co.*, 231 F. Supp. 3d 357, 364-65 (N.D. Cal. 2017) (finding causation properly pleaded for nuisance claim); *City of Spokane*, 2016 WL 6275164, at *8-9.

### B. Plaintiff Sufficiently Alleges Exposure to PCBs "at a Rate Significantly Greater" than the General Population and That Medical Monitoring is Necessary and Reasonable In Cost.

Defendants challenge three other elements of Plaintiff's § 7202 claim: that her children were exposed to PCBs "at a rate significantly greater than the general population" and that monitoring is both "necessary" and "reasonable in cost." Vt. Stat. Ann. tit. 12, § 7202(a)(1), (5), (6). In doing so, however, Defendants again seek to create pleading requirements that do not exist and quibble with the facts alleged in the Complaint—neither of which are proper on a motion to dismiss.

---

[7]     In *Port of Portland*, the court rejected Defendants' argument that the Port had to allege that Monsanto directly discharged PCBs into the contaminated waters or the role and conduct of third-party dischargers of PCBs. *Port of Portland*, 2017 WL 9098079, at *17. Because the PCBs found their way to the Oregon waters through rain runoff, it wasn't possible to determine what products the PCBs leaked from, who manufactured those products, or when those products were purchased. *Id*. This did not prevent the Port's claim from surviving at a motion to dismiss.

First, Plaintiff sufficiently alleges that her children were exposed to PCBs at a rate significantly greater than the general population. The PCB concentrations at the Cabot school—which her children attended—are approximately 210 ng/m3. (Dkt. 1 ¶¶ 80, 85.) This is over 5.5 times higher than those at the largest PCB superfund site, which registered a maximum PCB concentration of 38 ng/m3. (*Id.* ¶ 67.) Superfund sites are, by definition, toxic waste sites specifically identified by the EPA as requiring government-mandated remedial measures to clean up PCB contamination. Defendants cannot seriously contend that the general population is exposed to PCB concentrations on par with those of the largest PCB superfund site. It would be reasonable to infer, therefore, that the Cabot School PCB levels are significantly more than 5.5 times higher than those of the general public. *Koch v. Christie's Intern. PLC*, 699 F.3d 141, 145 (2d Cir. 2012) (courts must draw all reasonable inferences in favor of plaintiff on a motion to dismiss).

Defendants contend that Plaintiff has painted an "incomplete" picture of Cabot School's PCB levels, claiming that only certain areas of the Cabot School have registered high PCB levels and that a new round of testing registered lower levels of PCBs. (Dkt. 27 at 7-8, 21-22.) But Defendants arguably improperly pull from sources outside of the Complaint to contest the facts alleged. Defendants also claim—with no supporting authority—that Plaintiff must allege how long her three children attended the Cabot School and how often and for how long they visited the areas of the school that Defendants claim had the highest PCB concentrations. (*Id.* at 22.) While these are things that Monsanto is welcome to argue about at trial, that is not the standard for pleading causation under Rule 8's liberal pleading standards. *See Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) (a plaintiff need only provide "sufficient information to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know

whether there is a legal basis for recovery." (quotations omitted)). Ultimately, these are disputes of fact that will be hashed out in discovery and, potentially, through expert testimony.

Second, Plaintiff adequately alleges that her children are now at an increased risk of contracting a serious disease such that medical monitoring is necessary. Cabot School's PCB levels of 210 ng/m3 corresponds with a cancer risk greater than one in 100,000 for adults and significantly more for the students that attend the school. (Dkt. 1 ¶ 80.) Defendants do not claim that this increased risk does not make medical monitoring necessary. Rather, they claim that the NIOSH study and New Jersey recommendation sheet cited in the Complaint do not demonstrate that medical monitoring is necessary here because the PCB exposure levels in the studies are higher than those in the Cabot School. (Dkt. 27 at 22.) This is a red herring: these studies do not set minimum PCB levels that warrant medical monitoring. The PCB exposure levels that make medical monitoring necessary will be established by expert testimony. *See, e.g.*, *Saint-Gobain*, 431 F. Supp. 3d at 468-69; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 448 (2d Cir. 2013) (noting that "a medical monitoring cause of action . . . cannot be established without reliable expert testimony."). As all inferences must be made in her favor at this stage, Plaintiff has more than cleared the pleading hurdle with the cited material.

Third, Plaintiff adequately alleges that the cost of medical monitoring is reasonable. Plaintiff identifies the monitoring procedures that exist and are reasonable in cost—*e.g.* blood serum measurements, tissue sampling, and evaluation of skin, liver, and nervous systems—and she cites to two PCB medical monitoring programs that have already been implemented as support for their feasibility. (Dkt. 1 ¶¶ 81-84, 104.) This is not the type of "[t]hreadbare recital[]" that doesn't pass muster, (dkt. 27 at 23), especially for a question of fact that will, again, require expert testimony to establish at trial.

**III.      Plaintiff has Standing to Bring These Claims on Behalf of the Putative Class.**

Finally, Monsanto cloaks a Rule 23 class certification issue in the garb of Article III standing, arguing that Plaintiff's claims on behalf of her children are too dissimilar from the claims of students and staff who attended or worked at other schools to support standing. (Dkt. 27 at 23-24.) The Supreme Court has a "preference for dealing with modest variations between class members' claims as substantive questions, not jurisdictional ones." *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 95 (2d Cir. 2018) (citing *Gratz v. Bollinger*, 539 U.S. 244, 266 (2003)). Accordingly, once a named plaintiff establishes individual standing, this "shift[s] the focus of examination from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class.'" *Sosna v. Iowa*, 419 U.S. 393, 403 (1975) (quoting Fed. R. Civ. P. 23(a)); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263-64 & n.9 (1977).

Even if there are situations in which the disjuncture between the named plaintiff's claims and those of the putative class members is so great that it presents an issue of standing as opposed to the prudence of class certification, this is not one of them. *See Langan*, 897 F.3d at 93. Class standing is only implicated in limited circumstances where there is a stark difference between the plaintiff's and the class's claims, such as where the defendant that injured the absent class members did not injure the named plaintiff or where the *defendant's* conduct was dramatically different with respect to the named plaintiff and the putative class. *Id*. at 94. This is not the case here, so Monsanto's concerns are best left to the class certification stage. *See Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 438-39 (S.D.N.Y. 2020) (collecting cases denying motions to dismiss based on class standing where the induvial plaintiff has standing because the issue is better addressed at the class certification stage)

If the Court does address Defendants' concerns now, Plaintiff has standing to bring these

claims on behalf of the putative class. A plaintiff has class standing if they plausibly allege (1) that they personally have suffered some injury because of the defendant's conduct, and (2) that the "*conduct of the defendant*" that injured the named plaintiff "implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Barrows v. Becerra*, 24 F.4th 116, 129 (2d Cir. 2022) (emphasis added). Defendants don't contest that Plaintiff has individual standing. (Dkt. 27 at 23-24.) And the second prong is easily satisfied when the named plaintiff's injuries and the absent class members' injuries originate from a defendant's common conduct. *See, e.g.*, *Gratz*, 539 U.S. at 265 (finding that a university's uniform use of race in admissions of transfer students versus freshmen "does not implicate a significantly different set of concerns"); *Grossman v. Simply Nourish Pet Food Co. LLC*, 516 F. Supp. 3d 261, 276-77 (E.D.N.Y. 2021) (holding plaintiff satisfied class standing to represent class members who bought different products because the misrepresentation arose from the defendants' common marketing technique); *Gold v. Eva Nats., Inc.*, 586 F. Supp. 3d 158, 162 (E.D.N.Y. 2022) (same).

Here, Defendants' conduct—tortiously manufacturing, marketing, and selling PCBs while concealing their toxicity from the public—was exactly the same with respect to Plaintiff's children and the putative class members across schools. Plaintiff's children and the absent class members also share the same type of injury—exposure to toxic chemicals such that medical monitoring is necessary. Accordingly, Defendants' common conduct implicates the same set of concerns across the board.

Defendants rely on *Retirement Board of the Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon*, 775 F.3d 154 (2d Cir. 2014), but this case is distinguishable. In *Policemen's* the court explicitly rejected the plaintiffs' argument that the defendants engaged in a common course

of conduct for which liability could be determined with common proof. *Id*. at 162-63. There, defendants had different obligations with respect to trust at issue, so breach turned on an examination of the *defendant's conduct* on a trust-by-trust basis, defeating class standing. *Id.*

Defendants also argue that class standing is negated by the fact that "individualized evidence" will be required to establish the PCB levels at different schools and each class member's level of exposure. (Dkt. 27 at 24-25.) But this improperly "collapse[s] the standing inquiry into the class certification inquiry." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co*., 862 F. Supp. 2d 322, 333 (S.D.N.Y. 2012). Even the more stringent Rule 23 standard does not require that *every* question be answerable through common proof. For example, in *Sullivan v. Saint-Gobain Performance Plastics Corp.*, this Court ruled that individual differences in class members' PFAS levels, health history, and exposure source did not bar class certification. No. 5:16-CV-125, 2019 WL 8272995, at *15-16 (D. Vt. Aug. 23, 2019). Defendants are welcome to raise arguments about these "modest variations" between claims when it is appropriate to address them—at class certification. *Langan*, 897 F.3d at 95.

## IV.     In the Alternative, Plaintiff Should be Permitted Leave to Amend Her Complaint.

If the Court grants any aspect of Defendants' Motion to Dismiss, Plaintiff respectfully requests leave to amend her Complaint. "When a party requests leave to amend h[er] complaint, permission generally should be freely granted" unless the court determines that amendment would be futile. *Grullon v. City of New Haven*, 720 F.3d 133, 139-140 (2d Cir. 2013).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss. In the alternative, the Court should grant Plaintiff leave to amend.

Dated: July 3, 2024

Respectfully submitted,

AMBER NEDDO, as guardian and next friend to Z.N., C.B., and A.B., and all others similarly situated,

By: */s/ Hannah Hilligoss*

J. Eli Wade-Scott (admitted *Pro Hac Vice*)
Hannah Hilligoss (admitted *Pro Hac Vice*)
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
ewadescott@edelson.com
hhilligoss@edelson.com

By: */s/ Jimmy Rock*

Jimmy Rock
EDELSON PC
1255 Union Street NE, 7th Floor
Washington, DC 20002
Tel: 202.270.4777
jrock@edelson.com