**ENTRY ORDER**

VERMONT SUPREME COURT
FILED IN CLERK'S OFFICE

DEC 12 2025

2025 VT 64

SUPREME COURT DOCKET NO. 24-AP-342

SEPTEMBER TERM, 2025

| | |
|---|---|
| Amber Neddo, as Guardian & Next Friend to Z.N., C.B., & A.B., et al. | } Original Jurisdiction |
| | } |
| | } Federal Certified Question |
| v. | } |
| | } |
| Monsanto Company et al. | } CASE NO. 2:23-cv-00396 |

In the above-entitled cause, the Clerk will enter:

For the reasons discussed herein, we answer Question 1 in the affirmative, Question 2(a) in the negative, and Question 2(b) in the affirmative.

FOR THE COURT:

_____
Nancy J. Waples, Associate Justice

Concurring:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
William D. Cohen, Associate Justice

_____
Cortland Corsones, Superior Judge,
Specially Assigned

NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 64

No. 24-AP-342

VERMONT SUPREME COURT
FILED IN CLERK'S OFFICE

DEC 1 2 2025

Amber Neddo, as Guardian & Next Friend to
Z.N., C.B., & A.B., et al.

v.

Monsanto Company et al.

Original Jurisdiction

Federal Certified Question

September Term, 2025

Geoffrey W. Crawford, J.

Joslyn Wilschek and Anthony Iarrapino of Wilschek Iarrapino Law Office PLLC, Montpelier, and Roger Perlstadt, J. Eli Wade-Scott, and Hannah Hilligoss of Edelson PC, Chicago, Illinois, for Plaintiff-Appellant.

Ian P. Carleton, Alexandrea L. Nelson, Devin T. McKnight, and Hannah C. Waite of Sheehey Furlong & Behm P.C., Burlington, Lauren R. Goldman of Gibson, Dunn & Crutcher LLP, New York, New York, and Amir C. Tayrani, Russell B. Balikian, and Zachary Tyree of Gibson, Dunn & Crutcher LLP, Washington, DC, for Defendants-Appellees.

PRESENT: Reiber, C.J., Eaton, Cohen and Waples, JJ., and Corsones, Supr. J., Specially Assigned

¶ 1.   **WAPLES, J.** This is a federal diversity action brought by plaintiff on behalf of her minor children and putative class members who were allegedly exposed to toxic chemicals manufactured by defendants and used in Vermont public schools. Plaintiff seeks to hold defendants liable for the costs of medical monitoring under 12 V.S.A. § 7202. We accepted review of the following two questions certified by the U.S. District Court for the District of Vermont:

> Question 1: Was a toxic substance "released" from a facility within the meaning of Vermont's medical-monitoring statute, Vt. Stat. Ann. Tit. 12, §§ 7201-02, where a manufacturer sold a toxic substance from facilities outside Vermont to third parties who

> incorporated the toxic substance into finished products used in Vermont schools, and the toxic substance subsequently leaked into the air of the Vermont schools?
>
> Question 2: Does Vermont's medical-monitoring statute provide a remedy under the following circumstances: (a) to a plaintiff whose exposure to a toxic substance occurred before the statute was enacted; or (b) against a defendant who sold a toxic substance to a third-party before the statute was enacted.

As explained below, we answer Question 1 in the affirmative, Question 2(a) in the negative, and Question 2(b) in the affirmative.

## I. Facts

¶ 2.  The following facts are undisputed for purposes of this appeal. From the 1930s until the late 1970s, defendants' predecessor, the former Monsanto Company (Old Monsanto), was the only commercial manufacturer of chemicals called polychlorinated biphenyls (PCBs). Old Monsanto knew that PCBs were toxic as early as 1937, and its knowledge of the chemical's toxicity grew steadily through 1979, when Congress banned the commercial manufacturing and distribution of PCBs.[1] Old Monsanto manufactured PCBs at facilities in Alabama and Illinois.

¶ 3.  Old Monsanto sold and distributed PCBs from those two facilities to third-party manufacturers for incorporation into finished products. Old Monsanto knew that PCBs would inevitably leak from virtually all finished products. The third-party manufacturers used PCBs in a range of industrial and commercial applications, including in building materials such as

---

[1] Plaintiff asserts, and defendants do not dispute for purposes of this appeal, that PCBs are "proven toxic substances" under Vermont's medical monitoring statute because they "may cause personal injury or disease to humans" and are defined as a hazardous material under Vermont's waste-management act. 12 V.S.A. § 7201(10)(A); see 10 V.S.A. § 6602(16)(A)(i) (defining "hazardous material" to include "any substance defined in section 101(14) of the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980"); 42 U.S.C. § 9601(14)(A) (defining "hazardous substance" as "any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act"); 40 C.F.R. § 116.4 (listing PCBs as hazardous substances). According to plaintiff's complaint, PCBs are known to be carcinogenic. They can also negatively affect brain development in children and reproductive health, suppress the immune system, and cause liver, kidney, and lung damage, skin irritation, endocrine disruption, cardiac arrythmia, gastrointestinal disturbances, and numbness in the extremities.

fluorescent light ballasts and caulk. Some of these finished products were incorporated into Vermont schools. PCBs later leaked from those products into the air in Vermont schools.

¶ 4.   Plaintiff brought this action in the U.S. District Court for the District of Vermont on behalf of her three children, who were exposed to elevated PCB levels while attending the Cabot School in Vermont, and a putative class of individuals who attended or worked at the twenty-six Vermont schools with high levels of PCBs. Plaintiff sought medical monitoring directed at identifying and diagnosing cancers and other illnesses that she alleged were associated with PCB exposure under Vermont's medical-monitoring statute, 12 V.S.A. §§ 7201-02.

¶ 5.   Defendants moved to dismiss the complaint on various grounds, including that the medical-monitoring statute only applied to releases of toxic substances directly from facilities such as factories located within Vermont, and the statute did not apply retroactively to releases prior to July 1, 2022, the date it became effective. The federal district court certified these two questions to this Court.

II. Whether PCBs Were "Released" Within the Meaning of the Medical-Monitoring Statute

¶ 6.   Vermont's medical-monitoring statute was enacted in 2022 and codified at 12 V.S.A. §§ 7201-02. 2021, No. 93 (Adj. Sess.), § 1. The statute provides "the exclusive remedy for a person without a present injury to bring a cause of action to seek medical monitoring due to exposure to a proven toxic substance." 12 V.S.A. § 7202(d). Section 7202(a) provides as follows:

> A person without a present injury or disease shall have a cause of action for the remedy of medical monitoring against a person who is the owner or operator of a large facility from which a proven toxic substance was released if all of the following are demonstrated by a preponderance of the evidence:
>
> (1) exposure at a rate significantly greater than the general population;
>
> (2) to a proven toxic substance;
>
> (3) as a result of tortious conduct of the defendant;

3

>    (4) as a proximate result of the exposure, plaintiffs have suffered an increased risk of contracting a serious disease;
>
>    (5) the increased risk makes it medically necessary for the plaintiffs to undergo periodic medical examination different from that prescribed for the general population in the absence of exposure; and
>
>    (6) monitoring procedures exist that are reasonable in cost and safe for use.

If the plaintiff demonstrates that the criteria set forth in § 7202(a) are satisfied, the court must order the defendant to pay the award to a court-supervised medical-monitoring program and award the plaintiff reasonable attorney's fees and costs. Id. § 7202(b)-(c).

¶ 7.   For purposes of the certified questions, it is undisputed that Old Monsanto was "the owner or operator of a large facility" outside the state of Vermont and that PCBs are "a proven toxic substance." The first question for our review is whether Old Monsanto's sale of PCBs to third parties that incorporated the chemicals into products from which they eventually leaked into the air of Vermont schools constitutes a "release" within the meaning of §§ 7201-7202.

¶ 8.   Our primary goal when interpreting a statute is to effectuate legislative intent. In re Hinsdale Farm, 2004 VT 72, ¶ 5, 177 Vt. 115, 858 A.2d 249. "[I]n seeking that intent we look to the words of the statute itself, the legislative history and circumstances surrounding its enactment, and the legislative policy it was designed to implement." Perry v. Vt. Med. Prac. Bd., 169 Vt. 399, 406, 737 A.2d 900, 905 (1999). However, if the "plain language resolves the conflict without doing violence to the legislative scheme, there is no need to go further." Lubinsky v. Fair Haven Zoning Bd., 148 Vt. 47, 49, 527 A.2d 227, 228 (1986).

¶ 9.   The medical-monitoring statute defines "release" to mean "any act or omission that allows a proven toxic substance to enter the air, land, surface water, or groundwater." 12 V.S.A. § 7201(11) (emphasis added). " 'Any' means 'every'; its meaning is 'expansive' rather than restrictive." Eisenhauer v. Culinary Inst. of Am., 84 F.4th 507, 517 (2d Cir. 2023); see also Babb

4

v. Wilkie, 589 U.S. 399, 405 n.2 (2020) ("[T]he word 'any' has an expansive meaning." (quotation omitted)). The use of the term "any" in the statutory definition indicates that the Legislature intended the term "release" to be interpreted broadly. Further, the statute contains no limitation on the timing or location of a release; it requires only that the release originate from a large facility. 12 V.S.A. § 7202(a). On its face, the statute does not require the large facility to be in Vermont or the release to have occurred directly into Vermont's environment. We therefore agree with plaintiff that under the plain language of the statute, Old Monsanto's sale of PCBs from its facilities to third-party manufacturers was a release because it was an act that eventually allowed PCBs to enter the air of Vermont schools.

¶ 10.   Defendants contend that the statute must be interpreted to impose liability solely when a proven toxic substance is released <u>directly</u> from a large facility into Vermont's environment. However, neither § 7201(11) nor § 7202(a) contains the term "directly," or any similar word. When the statutory language is plain, we presume the Legislature intended its ordinary meaning, and "[w]e will not read an implied condition into a statute unless it is necessary in order to make the statute effective." Brennan v. Town of Colchester, 169 Vt. 175, 177, 730 A.2d 601, 603 (1999) (emphasis and quotation omitted). The word "directly" is not necessary to effectuate the statute. The existing language is sufficient to carry out its purpose, which is to allocate responsibility for the costs of monitoring for early detection of latent disease resulting from exposure among manufacturers and users of toxic substances that enter Vermont's environment, rather than an individual exposed to those substances. The statute, "having benevolent objectives, is remedial in nature and must be given a liberal construction." Montgomery v. Brinver Corp., 142 Vt. 461, 463, 457 A.2d 644, 646 (1983). While defendants cite various other definitions of the term "release" to support their position, the only definition relevant here is the statutory definition, which is broad and unambiguous. See Digit. Realty Tr.,

5

Inc. v. Somers, 583 U.S. 149, 160 (2018) ("When a statute includes an explicit definition, we must follow that definition . . . ." (quotation omitted)).

¶ 11. Because the statutory language is clear, we need not look further. Lubinsky, 148 Vt. at 49, 527 A.2d at 228. Defendants argue, however, that the plain language of the statute is contrary to legislative intent. See Inst. of Pro. Prac., Inc. v. Town of Berlin, 174 Vt. 535, 536, 811 A.2d 1238, 1240 (2002) (mem.) (explaining that if literal meaning of statutory language is inconsistent with legislative intent, "the intent must prevail"). Our review of the legislative history and the policy behind the statute does not support defendants' claim.

¶ 12. To understand the intent of the medical-monitoring statute, it is important to understand the context in which the statute was enacted. Medical monitoring first arose as a judicially created way to provide a remedy for individuals exposed to toxic-waste pollution, who faced many practical and legal barriers to recovery under the common-law tort system. See P. Strand, The Inapplicability of Traditional Tort Analysis to Environmental Risks: The Example of Toxic Waste Pollution Victim Compensation, 35 Stan. L. Rev. 575, 580-86 (1983) (describing legal barriers to recovery for harm caused by toxic waste under common law). One of the primary obstacles to recovery for such individuals was the lag between exposure to the toxic substance and manifestation of injury, id. at 580-81, because recovery under tort law typically required proof of present physical injury or property damage. See, e.g., Zeno-Ethridge v. Comcast Corp., 2024 VT 16, ¶ 33, 219 Vt. 121, 315 A.3d 978 ("An 'actual injury,' for purposes of a personal injury negligence claim, most often equates to physical injuries.").

¶ 13. To address this problem, in the 1980s and 90s some courts began to recognize a cause of action to recover the reasonable costs of medical examinations to detect physical harm arising from exposure to toxic substances. See, e.g., Ayers v. Jackson Twp., 525 A.2d 287, 312 (N.J. 1987) (recognizing claim for cost of "medical surveillance" based on increased risk of disease resulting from plaintiffs' exposure to toxic chemicals that leached into groundwater from township

6

landfill); In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 850, 852 (3d Cir. 1990) (listing cases, and predicting that Pennsylvania courts would recognize claim for medical monitoring brought by plaintiffs who were exposed to PCBs as result of living or working near polluted railyard). These courts reasoned that "[a]llowing plaintiffs to recover the cost of this care deters irresponsible discharge of toxic chemicals by defendants and encourages plaintiffs to detect and treat their injuries as soon as possible." In re Paoli R.R. Yard PCB Litig., 916 F.2d at 852.

¶ 14. The trend was not uniform, however. Numerous other jurisdictions declined to recognize a cause of action for medical monitoring for exposure to toxic substances in the absence of proof of present physical injury resulting from the exposure. See, e.g., Metro-N. Commuter R.R. v. Buckley, 521 U.S. 424, 444 (1997) (holding that Federal Employers' Liability Act did not permit award of lump sum to compensate for cost of extra medical checkups resulting from employee's exposure to asbestos); Baker v. Croda Inc., 304 A.3d 191, 194 (Del. 2023) (rejecting medical-monitoring claim because "an increased risk of illness without physical harm is not a cognizable injury under Delaware law"); Caronia v. Philip Morris USA, Inc., 5 N.E.3d 11, 18 (N.Y. 2013) (declining to recognize judicially created independent cause of action for medical monitoring absent evidence of present physical injury or property damage under New York law); Henry v. Dow Chem. Co., 701 N.W.2d 684, 689 (Mich. 2005) (holding Michigan law did not permit claim for medical monitoring in absence of proof of actual injury resulting from exposure to toxic substance). Prior to this case, no Vermont state court had addressed whether medical monitoring was available as a common-law cause of action.

¶ 15. In early 2016, following reports of groundwater contamination in nearby Hoosick Falls, New York, the Vermont Department of Environmental Conservation tested several wells near the site of the Saint-Gobain Performance Plastics Corporation manufacturing plant in North Bennington, Vermont. The water from each well contained high levels of perfluorooctanoic acid (PFOA). Vt. Dep't of Health, PFOA in Drinking Water 2016 (Apr. 14, 2025), https://

7

www.healthvermont.gov/environment/reports-responses-special-projects/pfoa-drinking-water-2016 [https://perma.cc/MBD7-SZZM]. PFOA is a manmade chemical that accumulates in the body and can cause cancer and other diseases. Vt. Dep't of Health, Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Drinking Water (Sep. 4, 2025), https://www.healthvermont.gov/environment/drinking-water/perfluoroalkyl-and-polyfluoroalkyl-substances-pfas-drinking-water [https://perma.cc/8YTK-7BY7].

¶ 16. Following the discovery, several Bennington-area residents filed a class action in federal court, alleging that Saint-Gobain and its predecessor ChemFab Corporation caused groundwater contamination by discharging PFOA from their facilities. Sullivan v. Saint-Gobain Performance Plastics Corp., 226 F. Supp. 3d 288, 291 (D. Vt. 2016). The plaintiffs sought medical monitoring and other relief. Id. at 292.

¶ 17. Around the same time, and in response to the Bennington PFOA crisis, the Legislature passed Act 154, which contained a provision requiring the Agency of Natural Resources to establish a working group to recommend how to improve state laws governing exposure to toxic chemicals. 2015, No. 154 (Adj. Sess.), § 10(b)(6). The group issued a report recommending that the Legislature strengthen civil remedies available to Vermonters, including by authorizing a cause of action for medical monitoring. See Agency of Nat. Res., Act 154 Chemical Use Working Group, Report on Toxic Chemical Use in the State of Vermont, at 2 (Jan. 13, 2017), https://anr.vermont.gov/sites/anr/files/specialtopics/Act154ChemicalUse/2017_1_13_FINAL_Act%20154%20Legislative%20Report%20and%20Appendices.pdf [https://perma.cc/JZC5-DG62]. Proponents of the legislation explained that it was uncertain whether medical monitoring was available under Vermont decisional law and argued that the Legislature should therefore create a statutory remedy to create certainty for the Bennington residents and others who faced similar exposure. See K. Rumult, Modernizing Legal Remedies for a Toxic World, at 1, 11 (Jan. 17, 2018), https://legislature.vermont.gov/Documents/2018/

WorkGroups/Senate%20Judiciary/Bills/S.197/S.197~Ken%20Rumelt~Modernizing%20Legal%20l%20Remedies%20for%20a%20Toxic%20World~1-17-2018.pdf [https://perma.cc/8JHH-UZ5W].

¶ 18. During the 2017 and 2019 biennium sessions the Legislature twice attempted to pass the bill recommended by the Act 154 working group. See S.197, 2017-2018 Gen. Assem., Bien. Sess. (Vt. 2018); S.37, 2019-2020 Gen. Assem., Bien. Sess. (Vt. 2019). The Governor vetoed both bills based on concerns that they were too broadly worded and would drive up the cost of insurance and put Vermont manufacturers and other companies out of business. See Off. of Governor Phil Scott, Governor Scott's Veto Message for S.197 (May 23, 2018), https://governor.vermont.gov/governor-scotts-blog/governor-scotts-veto-message-s197 [https://perma.cc/YTC9-6M7Q]; Off. of Governor Phil Scott, S.37 Veto Letter (June 17, 2019), https://governor.vermont.gov/sites/scott/files/S.37%20veto%20letter%206-17-19.pdf [https://perma.cc/6V7Y-5XRM].

¶ 19. In late 2019, the U.S. District Court for the District of Vermont issued a decision predicting that Vermont state courts would recognize medical monitoring as a remedy for the Bennington residents affected by PFOA contamination. Sullivan v. Saint-Gobain Performance Plastics Corp., 431 F. Supp. 3d 448, 466 (D. Vt. 2019). The court reasoned that although Vermont law requires physical injury for many torts, recognizing a medical-monitoring remedy would not conflict with the purposes of the physical-injury rule. Id. at 452-53. The court further predicted that this Court would adopt the definition of physical injury set forth in the Restatement (Second) of Torts § 15, which states that "bodily harm" includes physical alterations to the body. Id. at 454. The court reasoned that allowing medical monitoring was consistent with Vermont's law of equitable remedies, and that the Governor had indicated a willingness to sign a modified version of the Legislature's bill authorizing such a remedy. Id. at 456-57. Based on these factors, case law from other jurisdictions, and "because of the presence of an objective test for exposure and

9

the relatively small, defined class of people who tested positive for PFOA after consuming water within the affected area," the court predicted that Vermont courts would allow medical monitoring as a remedy. Id. at 466. The court set forth a liability test modeled on those expressed in In re Paoli Railroad Yard PCB Litigation, 916 F.2d at 852, and Bower v. Westinghouse Electric Corp., 522 S.E.2d 424, 432-33 (W. Va. 1999). Sullivan, 431 F. Supp. 3d at 466.[2]

¶ 20. In 2022, the Legislature passed a third version of the medical-monitoring bill, Act 93, which incorporated a liability standard modeled on the test set forth in Sullivan. 2021, No. 93 (Adj. Sess.), § 1. The act was codified at 12 V.S.A. §§ 7201-7202. Testimony and documents submitted during committee hearings on Act 93 indicate that the Legislature intended to adopt the standard used by the U.S. District Court, with two exceptions. First, the bill used the term "toxic substance" instead of "hazardous substance," and included a definition of that term. Second, unlike Sullivan, which potentially allowed medical monitoring to be sought from any person who exposed the plaintiff to a toxic substance, the bill expressly limited liability to owners and operators of "large facilities" and excluded municipally owned properties. See M. O'Grady, Comparison of Medical Monitoring Elements, VT LEG 359633 v.1 (Jan. 19, 2022), https://legislature.vermont.gov/Documents/2022/WorkGroups/Senate%20Judiciary/Bills/S.113/Drafts,%20Amendments,%20and%20Legal%20Documents/S.113~Mike%20O'Grady~Comparison%20of%20Medical%20Monitoring%20%20Elements~1-19-2022.pdf [https://perma.cc/5N7G-E6ZL].

¶ 21. Defendants argue that the Legislature's decision to narrow the class of potential defendants indicates that the medical-monitoring statute was enacted solely to address the discharge of toxic chemicals directly into Vermont's environment. The record does not support

---

[2] In late 2021, the parties to Sullivan reached a settlement agreement. J. Therrien, $34M Settlement Agreement Reached in Bennington PFOA Suit, Bennington Banner (Nov. 11, 2021), https://www.benningtonbanner.com/local-news/34m-settlement-agreement-reached-in-bennington-pfoa-suit/article_c9f0e966-4332-11ec-9fbc-47021d1d3f5c.html [https://perma.cc/RW6B-AEGD].

10

defendants' position. The testimony and documents presented at hearings on the bill, as well as the preceding bills, demonstrate that the restriction to "owners and operators of large facilities" was intended to protect Vermont small businesses and towns from liability, out of fear that the cost of insurance would lead to financial ruin for those entities. See, e.g., Hearing on S.113 before H. Comm. on Judiciary, 2021-2022 Bien. Sess. (Vt. Mar. 16, 2022) (testimony of Michael O'Grady, Deputy Chief Couns., Off. of Legis. Couns.); Hearing on S.113 before S. Comm. on Judiciary, 2021-2022 Bien. Sess. (Vt. Jan. 27, 2022) (testimony of witnesses and discussion). The Legislature's decision to limit liability to large polluters does not demonstrate an intent to impose geographical or temporal limitations on releases generally.

¶ 22. To the contrary: the record indicates that it was anticipated that the medical-monitoring law would apply to releases of toxic substances that did not originate in a facility in Vermont. Michael O'Grady, Deputy Chief Counsel with the Office of Legislative Counsel, was involved in researching and drafting both S.113 and its predecessor bills. He presented S.113 to the Senate and House Judiciary Committees and the House Committee on Commerce and Economic Development. During a hearing before the House Judiciary Committee, a committee member asked O'Grady whether a large facility had to be in Vermont, or if the bill would apply to out-of-state businesses. He responded, "I think there's possibility for that if you can show that the release was caused by an out-of-state business through their introduction of products into commerce. I think that's a possibility," though he predicted that "most of these cases will be about releases in the state." Hearing on S.113 before H. Comm. on Judiciary, 2021-2022 Bien. Sess. (Vt. Mar. 16, 2022) (testimony of Michael O'Grady, Deputy Chief Couns., Off. of Legis. Couns.). Despite being alerted to this potential consequence, the Legislature did not modify the language to impose any geographic or temporal limits on releases. See Vt. Gen. Assemb., S.113 (Act 93), Detailed Status, https://legislature.vermont.gov/bill/status/2022/S.113 [https://perma.cc/YP3S-

11

PRXR] (last visited Dec. 3, 2025) (detailing House and Senate action on S.113). This history supports plaintiff's interpretation of the statutory language.

¶ 23. Defendants further argue that the Legislature's simultaneous amendments to Vermont's waste-management act indicate that the term "release" in the medical-monitoring statute can refer only to emissions of hazardous materials directly into Vermont's environment. Essentially, defendants contend that an expansion of the waste-management act was necessary to ensure liability for "release" from out-of-state facilities and because no such expansion was made for the medical-monitoring statute, its reach is more limited. As explained in more detail below, defendants' argument fails to account for the fact that the definition of facility is different in the two statutes.

¶ 24. Defendants' argument concerns an amendment to 10 V.S.A. § 6615, which contains a list of persons who are liable to the State for "abating a release or threatened release" of hazardous material. Prior to 2022, the list included "the owner or operator of a facility, or both," any person who owned a facility where hazardous materials were disposed, any person who arranged for disposal, and any person who accepted materials for disposal. 10 V.S.A. § 6615(a) (2021). In 2022, Act 93 added a fifth category to this list: "any person who manufactured for commercial sale a hazardous material and who knew or should have known that the material presented a threat of harm to human health or the natural environment." 2021, No. 93 (Adj. Sess.), § 2. The effect of the amendment was to extend liability for the State's costs of cleaning up toxic substances to manufacturers of those substances, whether or not the substances were directly released from their facilities into Vermont's environment. This expansion is consistent with the broad liability language in § 1 of Act 93.

¶ 25. Notably, during the same legislative session the Legislature amended the waste-management act's definition of "release" to specifically refer to PCBs in schools:

12

> "Release" means any intentional or unintentional action or omission resulting in the spilling, leaking, pumping, pouring, emitting, emptying, dumping, or disposing of hazardous materials into the surface or groundwaters, or onto the lands in the State, or into waters outside the jurisdiction of the State when damage may result to the public health, lands, waters, or natural resources within the jurisdiction of the State. "Release" also means the intentional or unintentional action or omission resulting in the spilling, leaking, emission, or disposal of polychlorinated biphenyls (PCBs) from building materials in public schools and approved and recognized independent schools, as those terms are defined in 16 V.S.A. § 11, that were constructed or renovated before 1980.

2021, No. 74, § E.709.3 and 2021, No. 185 (Adj. Sess.), § E.709.1 (codified as amended at 10 V.S.A. § 6602(17)). This amendment shows that the Legislature intended to impose consequences on manufacturers of hazardous materials that made their way into Vermont and eventually emitted toxic materials into the air, land, or water, even if the "release" was indirect or slow to occur.

¶ 26.   Defendants claim, however, that § 2 of Act 93 would have been unnecessary if a release included the sale of hazardous materials to a third party, because like the medical-monitoring statute, § 6615 already imposed liability on an "owner or operator of a facility." Defendants' argument ignores the fact that "facility" has a different definition in the waste-management act than in the medical-monitoring statute. For purposes of the waste-management act, a facility is defined as "all contiguous land, structures, other appurtenances, and improvements on the land, <u>used for treating, storing, or disposing of waste</u>." 10 V.S.A. § 6602(10) (emphasis added). Thus, prior to Act 93, the waste-management liability provision applied only to the owner or operator of a facility where waste was treated, stored, or disposed. The amendment in § 2 of Act 93 was necessary for the State to impose liability on manufacturers of hazardous materials that made their way into the State through commerce. In contrast, the medical-monitoring statute defines a facility more broadly to mean "all contiguous land, structures, other appurtenances, and improvements on the land where proven toxic substances are manufactured, processed, used, or stored." 12 V.S.A. § 7201(4). Because § 7201(4)'s definition of "facility" includes

13

manufacturing, when viewed in conjunction with § 7201(11)'s broad definition of "release" the medical-monitoring statute encompasses Old Monsanto's sale of PCBs that eventually made their way into Vermont.

¶ 27. We therefore answer the first certified question in the affirmative.[3]

### III. Retroactivity

¶ 28. The second certified question asks whether the medical-monitoring statute applies to a plaintiff whose exposure to a toxic substance occurred before the statute was enacted or against a defendant who sold a toxic substance to a third party before the statute was enacted. Because the statute creates a new right that did not previously exist under Vermont law, we conclude that the statute cannot apply to a plaintiff whose exposure occurred before the statute was enacted, but could apply to a defendant who sold a toxic substance prior to enactment if the plaintiff was exposed to the substance after July 1, 2022.

¶ 29. Vermont law typically prohibits retrospective application of new statutes. See 1 V.S.A. §§ 213, 214; Agency of Nat. Res. v. Towns, 173 Vt. 552, 555, 790 A.2d 450, 455 (2001) (mem.). "Retrospective laws are defined as those which take away or impair vested rights acquired under existing laws, or create a new obligation, impose a new duty, or attach a new disability in respect to transactions or considerations already past." Agency of Nat. Res. v. Godnick, 162 Vt. 588, 595, 652 A.2d 988, 992 (1994) (quotation omitted).

¶ 30. Statutes that are merely procedural or remedial, however, can operate retrospectively. Myott v. Myott, 149 Vt. 573, 575, 547 A.2d 1336, 1338 (1988). Procedural laws

---

[3] Our construction of the term "release" will not create limitless liability for manufacturers or other owners or operators of facilities from which toxic substances are released, as defendants contend. Plaintiffs seeking medical monitoring will still have the difficult burden of proving the six elements listed in § 7202(a): exposure to a proven toxic substance at a rate significantly greater than the general population, resulting from tortious conduct of the defendant, that proximately causes an increased risk of contracting a serious disease for which medical monitoring is necessary and available. The more attenuated the connection between the release and the exposure, the more difficult it will be for plaintiffs to prove these elements.

14

are those that " 'control only the method of obtaining redress or enforcement of rights and do not involve the creation of duties, rights, and obligations.' " Smiley v. State, 2015 VT 42, ¶ 18, 198 Vt. 529, 117 A.3d 441 (quoting Harris v. DiMattina, 462 S.E.2d 338, 340 (Va. 1995)). "By contrast, a remedial change, for retroactivity purposes, refers to an amendment that 'confirms existing rights by curing defects, mistakes, and omissions.' " West v. N. Branch Fire Dist. #1, 2021 VT 44, ¶ 16, 215 Vt. 93, 257 A.3d 856 (2021) (quoting 3 S. Singer, Sutherland Statutory Construction § 60:5 (8th ed. 2020)).

¶ 31.   The medical-monitoring statute is not "remedial," as we use that term in the retroactivity context, because it was not an amendment to an existing statute and did not merely correct or clarify prior law.[4] Compare In re D.K., 2012 VT 23, ¶ 9, 191 Vt. 328, 47 A.3d 347 (holding amendment to juvenile delinquency statute was not merely clarification because it "created an entirely new jurisdictional statute providing procedures for adjudicating delinquency petitions involving adult defendants where none existed before"), with West, 2021 VT 44, ¶ 49 (holding amendment to worker's compensation statute was remedial change because it was simply "modern, more respectful articulation of the incurable imbecility or insanity standard" that existed previously). It is also not procedural because it did not simply set forth a method for enforcing existing rights. Rather, the statute created a new right that had not previously been recognized under Vermont law: the right of a person without present physical injury to recover the costs of future medical expenses in the form of medical monitoring for early detection of diseases caused by exposure to toxic substances.

---

[4] When assessing retroactivity, the adjective "remedial" means interpretive or clarifying; it does not refer to the beneficial underlying goals of the statute. See 3 S. Singer, Sutherland Statutory Construction § 60:5 (8th ed. 2020) (noting distinction between "remedial" as used to describe "social legislation to promote the general health, safety, and welfare," and narrower meaning of "remedial" for purposes of retroactivity analysis).

¶ 32.   Plaintiff contends that the statute simply codified existing common law, pointing to the U.S. District Court's 2021 decision in Sullivan, which predicted that this Court would permit medical monitoring as a remedy for the plaintiffs in that case. 431 F. Supp. 3d at 466. However, "[s]uch a predictive judgment is not, in fact, state law; it is an 'Erie guess' as to what state law would be." Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co., 2014 IL 116389, ¶ 16, 10 N.E.3d 902 (quotation omitted). It is well-settled that "orders of federal district courts applying state law do not bind state courts." In re Ambassador Ins. Co., 2022 VT 11, ¶ 24, 216 Vt. 255, 275 A.3d 122. When the statute was enacted, no Vermont state court had recognized medical monitoring as a cause of action or remedy for persons who did not have a present physical injury.

¶ 33.   Further, we disagree with plaintiff's assertion that medical monitoring has "always" been available as a potential remedy in tort cases. While future medical expenses have long been recoverable as part of ordinary compensatory damages in personal injury cases, plaintiff identifies no Vermont case where a person without a physical injury has been allowed to recover such expenses. The cases cited by plaintiff all involve damages sought for actual physical injury. See Hebert v. Stanley, 124 Vt. 205, 210, 201 A.2d 698, 703 (1964) (holding expert testimony required to establish future medical expenses for plaintiff injured in car crash); Howley v. Kantor, 105 Vt. 128, 133, 163 A. 628, 631 (1933) (holding same).

¶ 34.   Moreover, it is not certain that Vermont courts would have recognized such a remedy under our common law. As explained above, while some jurisdictions have permitted claims for medical monitoring based on exposure alone, many others have held that actual injury is a prerequisite to recovery. Compare In re Paoli R.R. Yard PCB Litigation, 916 F.2d at 852 (predicting that Pennsylvania courts would allow cause of action for medical monitoring), with Baker, 304 A.3d at 194 (rejecting medical-monitoring claim because "an increased risk of illness without physical harm is not a cognizable injury under Delaware law"), and Brown v. Saint-

16

Gobain Performance Plastics Corp., 300 A.3d 949, 952 (N.H. 2023) (holding same under New Hampshire law). This Court has frequently reiterated the physical-injury requirement, at least for negligence cases; it is therefore possible that Vermont courts might have followed the latter path.[5] See, e.g., Long Trail House Condo. Ass'n v. Engelberth Constr., Inc., 2012 VT 80, ¶ 26, 192 Vt. 322, 59 A.3d 752 ("We require actual injury, not simply risk of harm, before one can recover in negligence."). We need not decide whether this Court would have recognized such a claim in an appropriate case, however. The point is that, given the unsettled status of medical monitoring as a remedy for persons without physical injury under Vermont law prior to the enactment of the statute, we cannot agree that 12 V.S.A. § 7202 merely codified existing rights. Cf. Soares v. Barnet Fire Dist. #2, 2022 VT 34, ¶ 36, 217 Vt. 49, 282 A.3d 1184 (holding that amendment to Open Meeting Law did not apply to pending suit because it created substantive change in law by setting forth process allowing recovery of attorney's fees against municipalities "where they had no such exposure before").

¶ 35. We have long held that, "unless the most clear and unequivocal language is used," a statute that substantively alters existing rights should not be applied retrospectively. Briggs v. Hubbard, 19 Vt. 86, 91 (1846). The medical-monitoring statute contains no language indicating that the remedy it creates is intended to apply retrospectively. Rather, the statute states that a person exposed to toxic substances "shall have a cause of action," which indicates prospective application. See Northwood AMC Corp. v. Am. Motors Corp., 139 Vt. 145, 149, 423 A.2d 846, 849 (1980) (construing terms "shall mean" and "shall be compensated" in statutory amendment to have prospective application "absent definite indication to the contrary").

---

[5] The medical-monitoring statute creates an exception to the actual-injury rule for persons who meet the evidentiary burden set forth in 12 V.S.A. § 7202. The general rule remains that actual injury is required to recover in negligence cases.

¶ 36. Significantly, the Legislature explicitly stated in Act 93 that the amendment to 10 V.S.A. § 6615 was to apply retrospectively, but it made no similar statement regarding the medical-monitoring statute. See 2021, No. 93 (Adj. Sess), § 3 ("Notwithstanding any contrary provision of 1 V.S.A. § 214, the amendment contained in 10 V.S.A. § 6615(a)(5) shall apply to any relevant release of a hazardous material regardless of the date of the relevant release, including releases that occurred prior to the effective date of 10 V.S.A. § 6615(a)(5)."). The Legislature's decision not to include a similar provision in the medical-monitoring portion of the statute supports our conclusion that the law applies only to exposures that occurred after the date of its enactment. See Ins. Co. of State of Pa. v. Johnson, 2009 VT 92, ¶ 9, 186 Vt. 435, 987 A.2d 276 ("[T]he rules of statutory construction normally demand that we accord significance to variations in legislative language."); cf. Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

¶ 37. We disagree, however, with defendants' assertion that § 7202 cannot be applied to them under any circumstances because Old Monsanto's sales of PCBs ceased in the 1970s. While the outcome of such a case might have been uncertain, defendants never had a right not to be sued for the costs of future medical expenses resulting from their alleged tortious conduct. See Carpenter v. Vt. Dep't of Motor Vehicles, 143 Vt. 329, 333, 465 A.2d 1379, 1382 (1983) (explaining that statute is not retrospective "because some of the requisites for its action are drawn from a time antecedent to its passage"; question is whether it affects rights existing prior to enactment (quotation omitted)). And it is well-settled that a new statute can apply where the act which triggers application of the statute occurs after the effective date of the statute. Id. Under § 7202(a), a person's right to seek medical monitoring arises when the person is exposed to a proven toxic substance. The statute creates no right or liability based on the release alone—

exposure is the trigger for recovery. Thus, the statute is not punishing defendants or imposing liability for past acts. Rather, it relates to current and future exposures arising from defendants' releases. Cf. United States v. Ne. Pharm. & Chem. Co., 810 F.2d 726, 741 (8th Cir. 1986) (holding Resource Conservation and Recovery Act of 1976 was not retroactive because it imposed liability for the present and future conditions—i.e., continued leaking of hazardous waste—resulting from defendant's prior dumping practices, which ceased prior to enactment). Accordingly, we conclude that the statute could apply to a defendant that sold a toxic substance before the statute was enacted if the plaintiff was exposed to the substance after July 1, 2022.

For the reasons discussed herein, we answer Question 1 in the affirmative, Question 2(a) in the negative, and Question 2(b) in the affirmative.

FOR THE COURT:

*Nancy Jean Waples*
Associate Justice

19